[No. 59239-0. En Banc. September 16, 1993.]

YAKIMA COUNTY (WEST VALLEY) FIRE PROTECTION DISTRICT
NO. 12, ET AL, *Appellants*, v. THE CITY
OF YAKIMA, *Respondent*.

372

374

*Thorner, Kennedy & Gano P.S.,* by *David A. Thorner* and *Blaine T. Connaughton,* for appellants.

*Preston Thorgrimson Shidler Gates & Ellis,* by *Elizabeth Thomas* and *Adam W. Gravley,* for respondent.

*Clark B. Snure* on behalf of Washington Fire Commissioners Association and Kitsap County Fire Protection District, amici curiae for appellants.

*Peter L. Buck; Shelley Kneip; C. Danny Clem, Prosecuting Attorney,* and *Reinhold P. Schuetz, Deputy;* and *Paul Marshall Parker* on behalf of Kitsap County and the Washington Association of Counties, amici curiae for appellants.

*William L. Cameron, Kennewick City Attorney,* on behalf of the Washington State Association of Municipal Attorneys, amicus curiae for respondent.

BRACHTENBACH, J. — In this declaratory judgment action, appellants challenge the validity of Outside Utility Agreements (OUA's) signed by appellant landowners as a condition of receiving sewer service from the City of Yakima (City), which required appellant landowners to sign a future petition for annexation when annexation of their property should become feasible. At issue in this case are: (1) whether the Yakima County Fire Protection District (Fire District) has standing to participate in this declaratory judgment action; (2) whether the City had a duty to provide sewer service to appellant landowners; (3) whether the City had authority to enter the OUA's; (4) whether the OUA's improperly required waiver of a future right; (5) whether the OUA's were invalid because based on misrepresentation or because mutual assent and/or consideration were lacking; (6) whether the OUA's were unconscionable, adhesion contracts, or against public policy; and (7) whether the OUA's deprived appellant landowners of their free speech rights guaranteed by the First Amendment. We hold that the OUA's are valid. We affirm the trial court's grant of summary judgment in favor of the City.

The City first announced its policy of requiring annexation of all areas to which sewer or water service is extended in a resolution adopted in 1965. The 1965 resolution provided that if annexation of a parcel was not feasible, sewer or water service would be extended to the parcel only if the landowner signed an "Outside Utility Agreement", which required the landowner to "sign any petition leading to the future annexation of said property to the City of Yakima". Clerk's Papers, at 9. The City's annexation policy was restated in a 1968 resolution, with the same requirement that an OUA be signed prior to extension of service to property that could not immediately be annexed.

In 1976, recognizing that "the existing sewage treatment facilities in the Yakima urban area do not meet the current water pollution control requirements", Clerk's Papers, at 104, the City, Yakima County, the Town of Union Gap, and the Terrace Heights Sewer District entered an agreement (4-party agreement) to deal with the situation. The agreement provided for the City's treatment plant to be upgraded to meet pollution control standards, and the City agreed to "accept sewage delivered to it" by the other three parties. Clerk's Papers, at 105. The upgrade, financed 75 percent by the Environmental Protection Agency, 15 percent by the State, and 10 percent by local funds, was completed in the early 1980's.

The 4-party agreement included a provision relating to the City's annexation policy:

> Except for the area served by the Terrace Heights Sewer District or the Town of Union Gap, now or in the future, property owners within the Yakima urban area who seek sewer service, through the formation of LID's or otherwise, shall be subject to the condition that any property owner seeking sewer service whose land is located within the urban boundary . . . shall, as a condition precedent to the receipt of sewer service by the City, be required to immediately annex to the City, if feasible to do so, or to sign an agreement, as a covenant running with the land, to the effect that a petition to annex to the City of Yakima will be signed if and when the landowner is asked by the City to do so.

Clerk's Papers, at 115.

Yakima County was not involved in the collection of sewage for delivery to the sewage treatment plant at the time the 4-party agreement was entered. However, the 4-party agreement left open a narrow option under which Yakima County could become involved in the collection of sewage.

The County of Yakima agrees that it will not, in the Yakima urban area, enter the service of sewage delivery unless all other entities involved have been unable or have refused to serve the area concerned on a basis acceptable to the residents, and an impasse has been reached. In that event, and if a necessity for such service for the health and welfare of the people in the area involved is determined to exist, the County agrees that it will not provide sewer service to such area without a delaying period of 90 days after the impasse has developed. . . .

Clerk's Papers, at 115.

In December 1981, the City, Yakima County and Union Gap adopted a comprehensive plan for the Yakima urban area. The City adopted the comprehensive plan through ordinance 2579. This plan summarized the 4-party agreement and restated the provisions of the 4-party agreement quoted above, relating to the requirement of annexation to the City and the right of Yakima County to provide sewage collection services.

Floyd T. and Marian R. Leitch were the first of the two couples who are appellants in this action to enter an OUA with the City. They entered their OUA on May 20, 1981, prior to the City's adoption of the comprehensive plan through ordinance 2579 in December 1981. In 1981, the Leitches and their neighbors were having problems with their septic systems and their drainfields. One neighbor had sewage backing up into the tub, and another neighbor's home was condemned by the County Health Department because sewage was backing up when they ran their washing machine. The Leitches sought sewer service from the City, and the City required the Leitches to sign an OUA with the following provision concerning annexation:

The undersigned owner(s) further agrees (agree) that he (they) will sign any and all notices, petitions and any other documents requested at any time by the City leading to the

annexation to the City of Yakima of the property affected by this agreement, and will actively promote and participate in any such annexation proceedings; and that he (they) will not protest the future formation of any local improvement district for domestic water and/or sewer for any district which includes the property affected by this agreement.

Clerk's Papers, at 462. The OUA also required the Leitches to pay "all connection charges, service fees, future local improvement district assessments, if any, and any and all other charges and fees required by law to be paid for the service hereby applied for." Clerk's Papers, at 462.

Steven B. and Dianne L. Puhrmann, the second set of appellant landowners in this case, entered their OUA with the City in 1986. They signed their OUA at the closing on their purchase of a home within the Yakima urban area. Mr. Puhrmann stated in his deposition that he was aware, prior to closing, that the home they were purchasing was hooked up to the sewer system. The Puhrmanns explained that the OUA was represented to them as a closing document, that they were told signing it was necessary for them to be hooked up to the sewer, that they were told closing could not be completed unless they signed it, and that they signed it without reading it. The OUA signed by the Puhrmanns contained terms identical to the terms in the Leitches' OUA.

On April 10, 1991, the City sent letters to appellant landowners informing them of the City's intent to annex their area and requesting them to sign a "Notice of Intent To Initiate Annexation Proceedings", as required by their OUA's. The Fire District provides fire protection services to the area the City is seeking to annex. This action was filed by the appellant landowners, together with the Fire District, seeking a declaration that the OUA's entered by appellant landowners are void.

The City moved to have the Fire District dismissed from the action for lack of standing. The court granted the City's motion and dismissed the Fire District. The parties then filed cross motions for summary judgment. The trial court entered summary judgment in favor of the City. Following

the entry of summary judgment, the City moved for and was granted voluntary dismissal of its counterclaims. Appellants' motion for reconsideration was denied. Appellants then sought and were granted direct review by this court.

The first issue in this declaratory judgment action is whether the Fire District has standing to participate. The persons entitled to seek a declaratory judgment are described in RCW 7.24.020:

> A person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

Parties whose financial interests will be affected by the outcome of a declaratory judgment action have standing. *See Seattle Sch. Dist. 1 v. State*, 90 Wn.2d 476, 493, 585 P.2d 71 (1978) (holding that a school district has standing to challenge state legislation where "[t]he interests of the District are not theoretical; they involve actual financial constraints imposed upon the District by the challenged system itself"); *American States Ins. Co. v. Breesnee*, 49 Wn. App. 642, 645-46, 745 P.2d 518 (1987) (holding that an injured party's underinsured motorist carrier had standing in a declaratory judgment action between the party responsible for the accident and his liability insurer).

The Fire District argues that its financial interests are affected by this action. However, even giving RCW 7.24.020 a liberal construction as required by RCW 7.24.120, the Fire District does not have standing to take part in this declaratory judgment action. The Fire District argues that its financial interests are affected by the OUA's, in that it stands to lose a percentage of the value of its assets equal to the percentage of its territory that is part of the proposed annexation. However, as the trial judge repeatedly emphasized, the Fire District is not directly affected by the agreements. Instead, the Fire District's financial interests will be affected

only if annexation is ultimately successful. RCW 35.02.200. Although enforcement of the OUA's may make annexation easier, the validity of the OUA's is not determinative of annexation because the City's OUA's cover only about 66 percent of the value of the property in the area sought to be annexed. RCW 35.13.130 requires an annexation petition to be signed by the owners of property comprising 75 percent of the value of the area. In addition, even if enough landowners agree to sign the petition, review by the boundary review board will be necessary if requested by the board itself, by an affected government unit, or by 5 percent of the registered voters in the area or 5 percent of the affected landowners. RCW 36.93.100. Thus, in this case, in contrast to *Breesnee* and *Seattle Sch. Dist. 1*, the outcome of this action, concerning only the validity of the OUA's, will not have a sufficient impact on the Fire District to confer standing.

█ Nor does the Fire District have standing under the theory that

> [w]here a controversy is of serious public importance and immediately affects substantial segments of the population and its outcome will have a direct bearing on the commerce, finance, labor, industry or agriculture generally, questions of standing to maintain an action should be given less rigid and more liberal answer.

*Washington Natural Gas Co. v. PUD 1*, 77 Wn.2d 94, 96, 459 P.2d 633 (1969). The cases in which this "liberal" standing theory has been applied have been cases where the plaintiff whose standing was challenged was the only plaintiff in the case and the "liberal" standing analysis was necessary to assure that the important public issues raised in those cases did not escape review. *See Seattle v. State*, 103 Wn.2d 663, 668, 694 P.2d 641 (1985) (allowing a city to raise an equal protection challenge to a portion of an annexation statute); *Farris v. Munro*, 99 Wn.2d 326, 330, 662 P.2d 821 (1983) (allowing a taxpayer to challenge the constitutionality of the State Lottery Act); *Vovos v. Grant*, 87 Wn.2d 697, 701, 555 P.2d 1343 (1976) (allowing the public defender to raise an issue of public importance to juveniles who would have "dif-

ficulty . . . [in] vindicat[ing] their rights on their own"). Here, as the trial judge pointed out, all the arguments raised by the Fire District could be adequately, if not more effectively, presented by the other plaintiffs in this case who were parties to the challenged OUA's.

■ Because the remaining issues in this case were decided on summary judgment, we will undertake the same analysis as the trial court. *Bowles v. Department of Retirement Sys.*, 121 Wn.2d 52, 61, 847 P.2d 440 (1993). Considering the facts in the light most favorable to the nonmoving party, we will affirm the trial court's grant of summary judgment if we determine "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c).

■ The second issue in this case is whether the City had a duty to provide sewer service to appellant landowners. Under RCW 35.67.310, which provides that a city "*may* permit connections with any of its sewers . . . from property beyond its limits", the City has authority to provide service outside its borders. (Italics ours.) The use of "may" in RCW 35.67.310 supports the City's argument that the power granted by RCW 35.67.310 is discretionary and that the City is not bound to provide sewer service to persons residing outside its boundaries. *See Issel v. State*, 39 Wn. App. 485, 487, 694 P.2d 34 (1984) ("may" is permissive or discretionary). Further support for the argument that a city has no duty to extend sewer service beyond its borders can be found in cases from this state. *See People for the Preserv. & Dev. of Five Mile Prairie v. Spokane*, 51 Wn. App. 816, 821, 755 P.2d 836 (1988); *Brookens v. Yakima*, 15 Wn. App. 464, 466, 550 P.2d 30, *review denied*, 87 Wn.2d 1011 (1976); *see also Colorado Springs v. Kitty Hawk Dev. Co.*, 154 Colo. 535, 543, 392 P.2d 467 (1964), *cert. denied*, 379 U.S. 647 (1965); 11 E. McQuillin, *Municipal Corporations* § 31.16, at 226-27 (3d ed. 1991).

However, there are several cases recognizing an exception to this "no duty" rule in circumstances where a city "holds itself out" as willing to supply sewer or water service to an

area or where a city is the exclusive supplier of sewer or water service in a region extending beyond the borders of the city. *See Barbaccia v. County of Santa Clara*, 451 F. Supp. 260, 264 n.2 (N.D. Cal. 1978) (commenting that "several state courts have recently held that a city holding itself out as the sole provider of sewer services in a given locale will be considered a public utility and allowed to deny sewer hook-ups to property within its 'service area' only for such utility-related reasons as lack of capacity") (citing *Robinson v. Boulder*, 190 Colo. 357, 547 P.2d 228 (1976), *overruled by Board of Cy. Comm'rs v. Denver Bd. of Water Comm'rs*, 718 P.2d 235, 244 (Colo. 1986); *Mayor & Coun. v. Delmarva Enters., Inc.*, 301 A.2d 276 (Del. 1973)). *See also Milwaukee v. Public Serv. Comm'n*, 268 Wis. 116, 120, 66 N.W.2d 716 (1954) (explaining that "[t]he basic question here is whether appellant has extended its service and is holding itself out to serve in the general area"). The Court of Appeals in *Brookens* recognized a similar exception. "A contract to supply water may also be found by implication, as where a municipality holds itself out as a public utility willing to supply all those who request service in a general area." (Footnote omitted.) *Brookens*, at 466 (citing *Milwaukee v. Public Serv. Comm'n, supra* at 124-25).

By entering the 4-party agreement and adopting the Yakima urban area comprehensive plan, which effectively established the City as the sole provider of sewer collection services to areas within the Yakima urban area not already served by Union Gap or the Terrace Heights Sewer District, the City did hold itself out as willing to provide service to the Yakima urban area. However, there is one fact present in this case that was not present in the cases cited above. The agreement that made the City the exclusive supplier of sewage treatment services, the 1976 4-party agreement, also set forth the City's policy of requiring present or future annexation as a condition of receiving service. Thus, to the extent that the City held itself out as willing to provide service, it made clear that it was willing to do so only if the landowner accepted its future annexation condition. *Cf. Brookens v.*

*Yakima, supra* at 467 (holding that "adoption by the City of a 1968 resolution to supply water only when the user complies with the Yakima General Plan for land use clearly manifests an intent not to supply the general area indiscriminately"). The City has no duty to provide service absent the future annexation condition, and the inclusion of this condition does not render the OUA's improper or invalid.

█ Alternatively, appellants argue that the City had a duty to provide sewer service to appellant landowners because the primary source of funding for the upgrade of the City's treatment plant was the federal government. However, appellants cite no legal authority to support this proposition. For that reason, we will not consider it. *State v. Benn*, 120 Wn.2d 631, 661, 845 P.2d 289 (1993).

The third issue in this case is whether the City had authority to enter the OUA's. As a general matter, "[m]unicipal corporations . . . may . . . contract". RCW 35.21.010. Appellants argue, however, that the City did not have authority to enter the OUA's because it failed to enact an ordinance prior to entering the OUA's, as, appellants argue, is required by RCW 35.67.350, which concerns provision of sewer service to persons residing outside a city's borders. RCW 35.67.310 provides:

> Every city or town may permit connections with any of its sewers . . . from property beyond its limits, *upon such terms, conditions and payments as may be prescribed by ordinance*, which may be required by the city or town to be evidenced by a written agreement . . ..

(Italics ours.)

The City argues that RCW 35.67.310 should be interpreted to mean that conditions on sewer service can be imposed by ordinance *or* contract. To support this argument the City relies on the rule of construction that "no part of a statute should be deemed inoperative or superfluous unless it is the result of obvious mistake or error." *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 13, 810 P.2d 917, 817 P.2d 1359 (1991). The City insists that its "alternative" interpretation is the only interpretation that gives meaning to all of the third

sentence of RCW 35.67.310 which provides: "If the terms and conditions of the ordinance *or of the agreement* are not kept and performed, or the payments made, as required, the city or town may disconnect the sewer . . .."

■■ The City points out that if all terms and conditions must be set out in an ordinance, then an "agreement" could not contain any additional terms and the disjunctive reference to the ordinance *or* the agreement would be without meaning. The statute contemplates the possibility of a term or condition other than payment which could be contained in an agreement independent of any ordinance. We agree that interpreting RCW 35.67.310 to allow the imposition of conditions on service either through an ordinance or through a contract is proper because it gives effect to every part of the statute. Under this interpretation of RCW 35.67.310, the City had authority to enter the OUA's.

The fourth issue in this case is whether the OUA's, with their requirement that appellant landowners sign an annexation petition in the future, entered at a time when annexation had not yet been initiated, are invalid because they required appellant landowners to waive a future right.

> The doctrine of waiver ordinarily applies to all rights or privileges to which a person is legally entitled. A waiver is the intentional and voluntary relinquishment of a known right . . . It is a voluntary act which implies a choice, by the party, to dispense with something of value or to forego some advantage. *The right, advantage, or benefit must exist at the time of the alleged waiver.* The one against whom waiver is claimed must have actual or constructive knowledge of the existence of the right.

(Italics ours.) *Bowman v. Webster*, 44 Wn.2d 667, 669, 269 P.2d 960 (1954).

Where a statutory right is involved, it cannot be waived before the statute creating the right becomes effective. *Ferndale v. Friberg*, 107 Wn.2d 602, 607, 732 P.2d 143 (1987). Here, RCW 35.13.130, which sets out the requirements for annexation under the petition method, including the requirement that "the petition must be signed by the owners of not less than seventy-five percent in value . . . of the property for

which annexation is petitioned", was in existence at the time appellant landowners entered their OUA's. Thus appellant landowners cannot rely on *Ferndale* to establish that the right waived in the OUA's was not in existence.

Nevertheless, appellant landowners argue the OUA's called for waiver of a future right because they lacked knowledge of the circumstances under which annexation would take place. For example, the geographic area that would be included in the annexation, the portion of the City's indebtedness the annexed property might have to assume, and whether adoption of a comprehensive plan would be necessary. If annexation had been initiated, some information about these matters would have been available, and the City would have been required to specify any requirements as to assumption of indebtedness and adoption of a comprehensive plan in the petition. RCW 35.13.125. RCW 35.13.125 provides in relevant part:

> Prior to the circulation of a petition for annexation, the initiating party or parties . . . shall notify the legislative body of the city or town in writing of their intention to commence annexation proceedings. The legislative body shall set a date, not later than sixty days after the filing of the request, for a meeting with the initiating parties to determine whether the city or town will accept, reject, or geographically modify the proposed annexation, whether it shall require the simultaneous adoption of the comprehensive plan . . . and whether it shall require the assumption of all or of any portion of existing city or town indebtedness by the area to be annexed. If the legislative body requires the assumption of all or of any portion of indebtedness and/or the adoption of a comprehensive plan, it shall record this action in its minutes and the petition for annexation shall be so drawn as to clearly indicate this fact.

In a case cited by appellants, the court held invalid a waiver of the right to seek judicial review of an annexation, signed prior to the initiation of annexation. *Doan v. Fort Wayne*, 253 Ind. 131, 252 N.E.2d 415 (1969). The court there concluded:

> [T]he right to remonstrate does not vest before territory is sought to be annexed.
>
> . . . .
>
> . . . [I]t is impossible to imagine how a landowner would know he were aggrieved or injuriously affected unless he knew

*when* and under *what* circumstances prospective annexation were to take place.

*Doan,* at 136. The court's concern was that

> to permit municipalities to secure waivers years in advance of annexation would render the terms of the statute meaningless. Common sense would tell us that a municipality, whose annexation scheme failed to satisfy the determinants set forth in the statute, would find no difficulty in executing it, if it could secure sufficient advance waivers to oust the court's jurisdiction.

*Doan,* at 138.

 The present case can be distinguished from *Doan* because the OUA's signed by appellant landowners did not require them to waive any of the review procedures provided by statute. Even if enforcement of the OUA's resulted in the gathering of sufficient signatures on the annexation petition involved in this case, the proposed annexation must go before the boundary review board for mandatory review under RCW 36.93.100 before becoming effective. In addition, if "any person owning real property or residing in the area affected by the decision" wants to appeal the decision of the boundary review board, judicial review is permitted under RCW 36.93-.160(5). The OUA's did not require waiver of this right. The waiver involved in this case relates only to a step in the process preceding statutorily mandated review and will not allow the City to avoid review of the proposed annexation. Thus the concerns motivating the court in *Doan* are not present in this case.

The validity of a waiver of the right to not sign an annexation petition, executed after initiation of annexation but prior to the filing of a petition for annexation, was considered by the Court of Appeals in *People for the Preserv. & Dev. of Five Mile Prairie v. Spokane,* 51 Wn. App. 816, 755 P.2d 836 (1988) (*Five Mile Prairie*). *Five Mile Prairie* involved contracts under which the City of Spokane provided water service to landowners outside the city limits in return for the landowners signing contracts requiring them to promote and sign any petitions for annexation. Although the contracts in *Five Mile Prairie* were entered before any petition for annexation had been filed, a

notice of intention to commence annexation had been filed with the city council and the City of Spokane had agreed to accept annexation subject to stated conditions before the relevant contracts were signed. On these facts, the Court of Appeals held that "the covenantors knew the circumstances under which the proposed annexation would take place", and that their waiver was a valid waiver of a known right. *Five Mile Prairie*, at 823, 824.

In *Five Mile Prairie*, information concerning the area to be annexed, assumption of indebtedness, and adoption of a comprehensive plan probably was available when the waiver occurred. Although not expressly discussed in the Court of Appeals opinion in *Five Mile Prairie*, the notice of intent to commence annexation filed there must have included some indication as to the scope of the proposed annexation because RCW 35.13.125 requires the notice of intent be presented by 10 percent of the residents "of the area to be annexed" or the owners of 10 percent of the property in the area. In addition, because RCW 35.13.125 requires conditions concerning assumption of indebtedness and the adoption of a comprehensive plan be indicated by the legislative body of the annexing entity when it considers the proposed annexation, this information probably was available in *Five Mile Prairie* where "the City had indicated its willingness to accept annexation *subject to certain conditions set by the City Plan Commission*." (Italics ours.) *Five Mile Prairie*, at 823.

Here, information concerning these matters was not available to appellant landowners when they entered their OUA's. Unlike the situation in *Five Mile Prairie*, no effort at initiating annexation of appellant landowners' property had occurred before appellant landowners signed their OUA's. The only notice appellant landowners had in this case, concerning the City's intent to annex their property, was general notice from two resolutions adopted in the 1960's and from the comprehensive plan for the Yakima urban area. However, neither of these sources of generalized notice gave any details concerning the City's annexation plan.

Because the purpose of the OUA's was to assure future annexation of property that could not be annexed at the time the OUA's were entered, by their very nature the OUA's carried uncertainty as to the amount of land that would be included in a future annexation. Neither was any information available concerning what conditions the City might impose on annexation. In addition, the OUA's did not refer to these areas of uncertainty.

Because the information that was available in *Five Mile Prairie* was not available in this case, we must decide whether the degree of knowledge found to be *sufficient* in *Five Mile Prairie* is also the degree of knowledge *necessary* for a waiver to be effective. We hold that a lesser degree of knowledge may be sufficient for a valid waiver to be found. Constructive knowledge of a right is sufficient for a valid waiver, *Bowman v. Webster*, 44 Wn.2d 667, 269 P.2d 960 (1954), and all persons are charged with constructive knowledge of the content of our state statutes, *Martin v. Seattle*, 111 Wn.2d 727, 735, 765 P.2d 257 (1988). Thus, the waivers in the OUA's are valid because RCW 35.13.125, which was in existence at the time appellant landowners signed their OUA's, provided constructive notice that the annexation petition that appellant landowners would be required to sign would specify the area to be annexed and could include conditions imposed by the City concerning assumption of indebtedness and adoption of a comprehensive plan.

The fifth challenge in this case involves a set of issues concerning contract formation. The Puhrmanns argue that their OUA is invalid because mutual assent is lacking and because misrepresentation occurred. All appellant landowners argue that their OUA's are invalid based on lack of consideration.

Mutual assent is required for the formation of a valid contract. "It is essential to the formation of a contract that the parties manifest to each other their mutual assent to the same bargain at the same time. Mutual assent generally takes the form of an offer and an acceptance." (Footnote

omitted.) *Pacific Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 555-56, 608 P.2d 266, *review denied*, 93 Wn.2d 1030 (1980). The offer element of mutual assent is met by "a promise to render a stated performance in exchange for a return promise being given." *Pacific Cascade Corp.*, at 556.

In this case, the OUA itself was the City's offer to the Puhrmanns. The OUA indicated the "stated performance" that the City was offering, the provision of sewer service, and it indicated the return promise that the City was seeking, payment and consent to future annexation. The Puhrmanns' signatures on their OUA indicated their acceptance. *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 944, 640 P.2d 1051 (1982) (holding that a party's signature on the contract is objective evidence of the party's intent to be bound by the contract).

■ The Puhrmanns' argument that their failure to read the OUA prevented them from manifesting assent to the OUA is without merit. Where a party has signed a contract without reading it, that party cannot successfully argue that mutual assent was lacking as long as the party was not deprived of the opportunity to read the contract, the contract was "plain and unambiguous", the party was capable of understanding the contract, and no fraud, deceit, or coercion occurred. *Skagit State Bank v. Rasmussen*, 109 Wn.2d 377, 381-84, 745 P.2d 37 (1987). The Puhrmanns were not prevented from reading the OUA. Mrs. Puhrmann stated at her deposition that, at closing, they did read the documents "having to do with the money that would be owed, the note basically", but that they did not ask for an opportunity to read the OUA. Clerk's Papers, at 351. The Puhrmanns have not argued that the OUA was ambiguous or that they would not have been capable of understanding it if they had read it. Thus, mutual assent existed unless there was a misrepresentation. We hold below that no misrepresentation has been shown.

Consideration is also an essential element of a contract. *Peoples Mortgage Co. v. Vista View Builders*, 6 Wn. App. 744, 747, 496 P.2d 354 (1972). Appellant landowners argue that

consideration was lacking under the theory that a promise to perform a preexisting duty does not constitute consideration. *Boardman v. Dorsett*, 38 Wn. App. 338, 341, 685 P.2d 615, *review denied*, 103 Wn.2d 1006 (1984). They argue that the City owed appellant landowners a duty to provide sewer service prior to and independent of the contract. This argument is foreclosed by our holding, above, that the City did not have a duty to provide sewer service to appellant landowners.

The Puhrmanns argue that, even if mutual assent and consideration existed, their OUA is void or voidable based on misrepresentation. A fraudulent misrepresentation or, under the right circumstances, even a material innocent misrepresentation can render a contract voidable. *Skagit State Bank v. Rasmussen, supra* at 384 (citing Restatement (Second) of Contracts § 164(1) (1981)). The Restatement (Second) of Contracts § 164(1) (1981) provides: "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."

The dispositive question here is whether the Puhrmanns have demonstrated that any misrepresentation, in fact, occurred. A misrepresentation is "an assertion that is not in accord with the facts." Restatement (Second) of Contracts § 159 (1981). At her deposition, Mrs. Puhrmann stated that the OUA was presented with the closing documents and that they were told signing the OUA "allowed us to be hooked up to sewer and that all people in the West Valley area who were on sewer were required to sign it, it was a requirement, it was a requirement of purchase of our house." Clerk's Papers, at 350-51. She further stated that they were told the sale could not go through unless the OUA was signed. The Puhrmanns have not explained how any of these statements were not in accord with the facts.

There is ample evidence in this case, in the 1976 4-party agreement and the Yakima urban area comprehensive plan, that signing an OUA was a requirement of receiving

sewer service from the City. It could also be true that signing the OUA was necessary to closing, in that the lender may have been unwilling to loan money for purchase of a home that was not going to have sewer service. The burden of establishing the elements of misrepresentation is on the party seeking to have the contract voided. *See Skagit State Bank*, at 384. The Puhrmanns' failure to present evidence demonstrating an assertion not in accord with the facts supports a holding that no genuine issue of material fact as to misrepresentation has been shown. Therefore, the trial court properly granted the City summary judgment on this issue.

■■ The sixth issue is whether the OUA's are void because unconscionable, or void as against public policy. Looking first at the doctrine of unconscionability:

> [T]hose cases interpreting the doctrine appear to fall within two classifications: (1) substantive unconscionability; and (2) procedural unconscionability. Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh, while procedural unconscionability relates to impropriety during the process of forming a contract. . . . procedural unconscionability [is] best described as a lack of "meaningful choice." . . . consideration must be given to "all the circumstances surrounding the transaction," including "[t]he manner in which the contract was entered," whether each party had "a reasonable opportunity to understand the terms of the contract," and whether "the important terms [were] hidden in a maze of fine print . . .".

(Citations omitted.) *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 259-60, 544 P.2d 20 (1975) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C. Cir. 1965)). Although the unconscionability issue in *Schroeder* arose under the Uniform Commercial Code, the above quoted portion as "part of a general exposition on unconscionability", *Jeffery v. Weintraub*, 32 Wn. App. 536, 542, 648 P.2d 914 (1982) is applicable beyond the Uniform Commercial Code context.

On the issue of substantive unconscionability, appellants argue that it was one sided and overly harsh to impose the annexation requirement on appellant landowners in addition to requiring them to pay for the sewer service. However, we

have determined that the City had no duty to provide service to appellant landowners, and RCW 35.67.310, discussed above with regard to the City's authority, contemplates the imposition of conditions on the extraterritorial provision of service. Thus, the City's promise to provide sewer service, where it was not under any duty to do so, was consistent with RCW 35.67.310 and substantially benefited appellant landowners. In addition, the County of Yakima, as well as the other parties to the 1976 4-party agreement, determined that the City could best provide sewer service to the area in which appellant landowners reside and that annexation was an appropriate condition of receiving service. For these reasons, the OUA's were not one sided.

As to procedural unconscionability, the fact that the City did not have a duty to provide service is again relevant. In a case involving a contract similar to the OUA's in this case, the court held that the City did not create a situation of economic duress by imposing an annexation condition because the fact that the City was not bound to provide service outside its borders gave the City a legal right to impose the annexation condition. *Andres v. Perrysburg*, 47 Ohio App. 3d 51, 53-54, 546 N.E.2d 1377, 1380-81 (1988). The same analysis is applicable to this case under RCW 35.67.310.

Moreover, some choices did exist in this case. The Leitches might have been able to have their septic tank pumped out, or they might have been able to have another drainfield dug. Both couples could have approached Yakima County about providing sewer collection services if they could not reach a satisfactory agreement with the City. The 4-party agreement left open a narrow option for Yakima County to provide service under such circumstances. Appellant landowners did not present adequate evidence to demonstrate the existence of a genuine issue of material fact as to whether these were meaningful options. Thus, neither the economic duress theory nor the lack of meaningful choice argument supports a finding of unconscionability.

The result is the same under a specific application of the factors listed in *Schroeder*, which are (1) the circumstances

surrounding formation of the contract, (2) opportunity to read and understand the contract, and (3) the use of fine print for important terms. The 2-page OUA's clearly stated appellant landowners' obligations. In fact, Mrs. Leitch stated at her deposition that she understood they would be annexed. The Puhrmanns may not have read their OUA, but the fact that they read other documents at closing indicates that they were not deprived of the opportunity to understand the contents of the OUA. Moreover, the OUA's did not include any fine print. These circumstances do not indicate procedural unconscionability.

Appellants also argued that the OUA's were invalid adhesion contracts. However, to the extent that the characterization of a contract as an adhesion contract has any relevance to determining the *validity* of a contract, it is only in looking for procedural unconscionability:

> Assuming that we are dealing with an adhesion contract, it does not follow that the . . . clause is void. The characterization of a lease as an adhesion contract because exacted by reason of a gross disparity in bargaining power is to enable the court to protect the injured party from an unconscionable contract provision.

*Blakely v. Housing Auth.*, 8 Wn. App. 204, 213, 505 P.2d 151, *review denied*, 82 Wn.2d 1003 (1973). The factors considered in determining whether a contract is an adhesion contract are (1) whether the contract is a standard form printed contract, (2) whether it was "prepared by one party and submitted to the other on a 'take it or leave it' basis", and (3) whether there was "no true equality of bargaining power" between the parties. *Standard Oil Co. v. Perkins*, 347 F.2d 379, 383 n.5 (9th Cir. 1965), *quoted in Blakely*, 8 Wn. App. at 212-13. All of these factors are within the element of circumstances surrounding the formation of the contract, under the test described in *Schroeder* for procedural unconscionability. Therefore, because we have already analyzed the OUA's for procedural unconscionability, the adhesion contract argument adds nothing to our analysis.

Appellants also argue that the OUA's are void as against public policy. However, because appellants failed to present any legal authority or argument on this issue, we decline to consider the issue. *State v. Benn*, 120 Wn.2d 631, 661, 845 P.2d 289 (1993).

■ Appellants' final argument is that the provision in their OUA's, which requires them to promote annexation in addition to signing an annexation petition, violates appellant landowners' free speech rights guaranteed by the First Amendment. We will assume that appellant landowners' free speech rights are implicated by the requirement that they actively promote annexation. The general rule as to a government action that imposes a restraint on a First Amendment freedom is that it "comes into court bearing a heavy presumption *against* its constitutionality." *Fine Arts Guild, Inc. v. Seattle*, 74 Wn.2d 503, 506, 445 P.2d 602 (1968). However, this court has stated that " '[w]e are of the opinion the right of freedom of speech is not absolute.' " *Fine Arts Guild, Inc.*, at 512 (quoting *Shively v. Garage Employees Local Union 44*, 6 Wn.2d 560, 567, 108 P.2d 354 (1940)). In addition, we have held: "Constitutional rights can be waived." *In re Adoption of Jackson*, 89 Wn.2d 945, 952, 578 P.2d 33 (1978). The City relies on a waiver argument to support the OUA's.

■ It is not easy to demonstrate a valid waiver of a First Amendment right. "The Supreme Court has said that waivers of First Amendment rights are to be inferred only in 'clear and compelling' circumstances." *Rhinehart v. Seattle Times Co.*, 98 Wn.2d 226, 239 n.4, 654 P.2d 673 (1982) (quoting *Curtis Pub'g Co. v. Butts*, 388 U.S. 130, 145, 18 L. Ed. 2d 1094, 87 S. Ct. 1975, *reh'g denied*, 389 U.S. 889, 19 L. Ed. 2d 197, 88 S. Ct. 11 (1967)), *aff'd*, 467 U.S. 20, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984). "Moreover, it is well established that courts closely scrutinize waivers of constitutional rights, and 'indulge every reasonable presumption against a waiver.' " *Sambo's Restaurants, Inc. v. Ann Arbor*, 663 F.2d 686, 690 (6th Cir. 1981) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 81 L. Ed. 1177, 57 S. Ct. 809 (1937)).

Without reference to these principles, the Court of Appeals in *People for the Preserv. & Dev. of Five Mile Prairie v. Spokane*, 51 Wn. App. 816, 755 P.2d 836 (1988), which involved contracts similar to the OUA's at issue in this case, held that there was no First Amendment violation because: "(1) the covenant is unambiguous; (2) there is no showing that it was the product of coercion; and (3) in any event, the Landowners were allowed to voice their opposition to annexation at the City Council meetings." *Five Mile Prairie*, at 820. Because the landowners involved in *Five Mile Prairie* were allowed to voice their opposition, they were not deprived of the free speech rights asserted here.

In other cases, where it has been argued that a party waived a First Amendment right, courts have indicated that the criminal law standard of a waiver voluntarily, knowingly, and intelligently made might be applicable, and have required that, at the very least, the waiver of a First Amendment right be knowing. *See Glendale v. George*, 208 Cal. App. 3d 1394, 1398, 256 Cal. Rptr. 742, 744 (1989); *Messina v. Department of Job Serv.*, 341 N.W.2d 52, 60 (Iowa 1983).

We agree with these courts that, to be valid, a waiver of a First Amendment right must at least be knowing. Because the evidence presented on summary judgment does not establish that appellant landowners had knowledge that the OUA's required them to waive a First Amendment right to speak out against annexation, we need not decide what other requirements must be satisfied for a valid waiver. As to the Leitches, the record shows only that Mrs. Leitch was aware that they would be required to annex, not that they would be compelled to "actively promote" annexation. As to the Puhrmanns, the record reflects that they did not read their agreement. The City has not suggested any alternative source from which the Puhrmanns might have gained knowledge of the "actively promote" provision in the OUA. This lack of evidence to demonstrate a knowing waiver defeats the City's waiver argument.

However, the failure of the waiver argument does not lead us to the conclusion that the entire OUA is invalid.

> If less than all of an agreement is unenforceable under the rule stated in § 178 [term unenforceable on public policy grounds, including illegality], a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange.

Restatement (Second) of Contracts § 184(1) (1981). *See also* 15 S. Williston, *Contracts* § 1779 (3d ed. 1972). Because this section allows enforcement of the legal portion of an agreement only where the unenforceable portion is not an "essential part" of the consideration given to support the contract, we believe it is a sound principle.

In determining whether the unenforceable portion of the contract is an "essential part of the agreed exchange", we should determine

> whether the parties would have entered into the agreement irrespective of the offending provisions of the contract. This can usually be determined by weighing of the equality of the agreed exchange [with and without the unenforceable part].

(Footnote omitted.) Calamari & Perillo, *Contracts* § 22-2(d) (3d ed. 1987). Under the OUA as written, the City is entitled to receive three things, payment for sewer service, signatures on an annexation petition, and active promotion of annexation. Out of these, the unenforceable "actively promote" term is the least significant. The payment term is significant to the City which has continuing costs for operation and maintenance of the sewage treatment plant. The signature term is the most significant term to the City's hopes for successful annexation because a signature on a petition is the only legally effective action a landowner can take in support of annexation under the procedures for annexation by the petition method. Active promotion of annexation might be helpful, but, even without it, appellant landowners' signatures on an annexation petition will still be legally effective. Because of the manifest significance of the payment and signature terms, we conclude that the "actively promote" term was not an essential part of the OUA's. The remainder of the OUA's is enforceable.

In their reply brief, appellants argue that the right to sign or to not sign an annexation petition is equivalent to the right to vote, which is protected by both the state and federal constitutions, and that this right is also violated by the OUA's. We decline to consider this issue. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Appellants have not demonstrated that the OUA's are invalid. Summary judgment was appropriate and the trial court is affirmed.

ANDERSEN, C.J., and UTTER, DOLLIVER, DURHAM, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.