[No. 44662-2-I.   Division One.   September 5, 2000.]

BOBBY FORD, *Respondent*, v. TRENDWEST RESORTS, INC., *Appellant*.

*Rosemary Daszkiewicz* and *J. Tate London* (of *Cairncross & Hempelmann, P.S.*), for appellant.

*Sidney J. Strong* and *Kimberley A. Konat* (of *Strong & Konat, P.S.*), for respondent.

ELLINGTON, J. — Trendwest Resorts, Inc., terminated Bobby Ford from his sales position for coming to work smelling of alcohol. Trendwest later offered to reinstate Ford if he signed the company's Employee Assistance Agreement, which provided that if he agreed to undergo treatment for alcohol abuse, the company would hold his position open, except where disciplinary action provided otherwise. Ford took the steps required of him by the agreement. When Ford asked to be reinstated, Trendwest declined to return him to his former position, and instead offered him a lesser position in a different department. Ford refused the offer, was terminated, and sued Trendwest for breach of contract. We hold that the trial court did not err in declining Trendwest's proposed instruction on mutual assent, because the dispute between Ford and his employer was one of contract interpretation, not formation. We also hold that Ford's status as an at-will employee did not preclude the court from permitting the jury to determine whether Ford was entitled to front pay damages. We therefore affirm.

## FACTS

Trendwest Resorts, Inc. (Trendwest) manages vacation properties which are available to member-owners who purchase credits redeemable for vacation intervals. Trendwest's sales employees work in one of three positions. Those who sell "on the line" give presentations to individuals interested in becoming member-owners. Those in the "Discovery Program" work to convert trial members to full membership.[1] Finally, those who work in "Upgrades" encourage existing members to purchase additional credits. The "Upgrades" job tends to be the most financially rewarding.

---

[1] The Discovery Program has since been discontinued.

Bobby Ford was a six-year employee of Trendwest who worked in the Upgrades program. On April 30, 1997, Ford's supervisor, Erin Miller, terminated Ford for reporting to work smelling of alcohol. Ford had received a warning approximately one year earlier under similar circumstances.

Upset by his termination, Ford began contacting individuals to see if there was any way he could get his Upgrades job back. Ford contacted Ron Buzard, Director of Sales, who promised to look into the matter. Ford also called Mike Jashinski, Miller's supervisor, who informed him that returning to Upgrades was not possible. Finally, Ford arranged a meeting with Trendwest President Bill Peare.

Prior to the meeting, Ford received a letter from Trendwest's Director of Staff Services, Karla Sperber, who offered to reinstate Ford if he participated in an Employee Assistance Program (EAP). The letter, dated May 8, stated in part:

> The reason for this letter is to officially extend . . . the use of the Employee Assistance Program to you. Please be advised that this is a mandatory referral process. Upon successful completion of the EAP, you will be allowed to return to a position equal to that which you held.

Ford testified that he was heartened by the letter because he thought it meant he could return to his Upgrades job.

On May 12, 1997, Ford and his wife met with Peare, Jashinski, and Sperber. Jashinski reiterated his position that Ford not be permitted to return to Upgrades, but suggested that Ford return to a sales position "on the line." Ford maintained his stance that he wanted to return to Upgrades. Unlike Jashinski, Peare did not express any opinion on the Upgrades issue.

At the meeting, Ford agreed to enter the EAP. Ford's termination was changed to an approved leave of absence.

The following day, Sperber mailed Ford the Employee

Assistance Agreement (EAA), a form contract used by Trendwest. Sperber, who was in charge of administering Trendwest's EAP program, had been responsible for approximately 27 other mandatory referrals that used the EAA. The agreement provided in pertinent part:

> The EMPLOYEE agrees that the above referenced circumstances[2] may require the COMPANY to institute disciplinary action independent of the outcome of rehabilitation . . . [After] five days, if the EAP recommended treatment is on an outpatient basis, . . . the EMPLOYEE will be allowed to return to work.
>
> . . . The COMPANY agrees to hold the EMPLOYEE'S job or position open during the EAP and return the EMPLOYEE to work upon successful completion of the program, except where the aforementioned disciplinary action provides otherwise.

Sperber attached a cover letter to the EAA, asking Ford to sign and return the agreement to Trendwest. Ford signed the agreement on May 28.

The day after meeting with Peare, Ford contacted the EAP counselor, who referred him to Gaaren Anderson for an alcohol assessment. Ford met with Anderson on three occasions, and then met with Kristin Rupert for a full evaluation on May 28 and 30, at which time he admitted he might have an alcohol problem. Rupert recommended intensive outpatient treatment.

When Ford called Trendwest to arrange his work schedule, Buzard and Jashinski informed him that he could not return to Upgrades, but that arrangements had been made for him to work in the Discovery Program. Because Discovery Program salespersons earned considerably less than those in Upgrades, Ford rejected the job. Trendwest terminated Ford on July 23, 1997.

---

[2] The "above referenced circumstances" are

[c]ircumstances occurring prior to and leading up to the signing of this agreement, [that] find the EMPLOYEE requesting professional counseling and treatment for a form of substance (drug or alcohol) abuse the consequences of which are likely to cause impairment of the EMPLOYEE'S physical and mental capacities to work safely.

Ford sued Trendwest, asserting that Trendwest breached the EAA by not returning him to his Upgrades position. A jury returned a $235,000 special verdict in favor of Ford. The court entered judgment on the verdict and denied Trendwest's motion for a new trial. On appeal, Trendwest argues that the court erred in declining to give mutual assent instructions and in permitting the jury to award Ford future earnings damages.

## DISCUSSION

■■■ The refusal to give a requested instruction is reviewed for abuse of discretion, *Stiley v. Block*, 130 Wn.2d 486, 498, 925 P.2d 194 (1996), and warrants reversal only if a party cannot argue its theory of the case or if the instructions, when read as a whole, are misleading or do not inform the jury of the applicable law. *Reninger v. Dep't of Corr.*, 79 Wn. App. 623, 639, 901 P.2d 325 (1995), *rev'd on other grounds by* 134 Wn.2d 437, 951 P.2d 782 (1998). "A trial court is required to instruct the jury on a theory only where there is substantial evidence to support it." *Stiley*, 130 Wn.2d at 498.

At trial, Trendwest proposed instructions requiring that the jury determine whether Ford and Trendwest mutually assented to the contract.[3] The trial court declined to give the instructions, finding that the issue at trial was not one of contract formation, but interpretation.

---

[3] Trendwest proposed the following instructions:

A contract is a legally enforceable promise or set of promises.

. . . .

In order for a contract to be legally enforceable, there must be mutual assent and consideration.

In order for there to be mutual assent, the parties must agree on the essential terms of the contract, and must express to each other their agreement to the same essential terms.

If you find that both Trendwest and Mr. Ford understood and agreed to the terms of the Employee Assistance Agreement, then there was mutual assent.

If you find that Mr. Ford or Trendwest did not understand or agree to the terms of the Employee Assistance Agreement, then there was no mutual assent and no contract which Mr. Ford can enforce.

Trendwest contends that the trial court abused its discretion by refusing to instruct the jury on mutual assent,[4] because the jury could have found that Ford and Trendwest did not share a common understanding of whether the company's prior termination of Ford was a "disciplinary action" that precluded him from returning to Upgrades, and consequently, no contract was formed.

■ Mutual assent, the modern expression for the concept of a "meeting of the minds," is required for the formation of a valid contract. *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388, 858 P.2d 245 (1993). Mutual assent generally takes the form of an offer and acceptance. *Yakima County*, 122 Wn.2d at 388. The existence of mutual assent is a question of fact. *Sea-Van Invs. Assocs. v. Hamilton*, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994).

■ When determining the mutual intentions of the contracting parties, Washington courts follow the objective manifestation theory. Therefore, the unexpressed subjective intention of the parties is irrelevant; the mutual assent of the parties must be determined by their objective acts or outward manifestations. *Multicare Med. Ctr. v. Dep't. of Soc. & Health Servs.*, 114 Wn.2d 572, 587, 790 P.2d 124 (1990).

■ In asserting its mutual assent claim, Trendwest looks to section 20 of the *Restatement (Second) of Contracts* for support. Section 20(1) provides:

20. Effect of Misunderstanding

(1) There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and

(a) neither party knows or has reason to know the meaning attached by the other; or

(b) each party knows or each party has reason to know the meaning attached by the other.

---

[4] Ford asserts that Trendwest waived the mutual assent argument by asserting that the EAA was a fully integrated contract. We find the record regarding Trendwest's lack of mutual assent claim to be sparse but adequate and reach the merits.

Comment (c) to section 20 explains: "Even though the parties manifest mutual assent to the same words of agreement, there may be no contract because of a material difference of understanding as to the terms of the exchange."

But comment (b) is equally important:

> Almost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy. *But material differences of meaning are a standard cause of contract disputes, and the decision of such disputes necessarily requires interpretation of the language and other conduct of the parties in light of the circumstances.*

RESTATEMENT (SECOND) OF CONTRACTS § 20 cmt. b (1979) (emphasis added). Williston adds:

> It is often stated broadly that if the parties do not understand the same thing there is no contract. But . . . it is clear that so broad a statement cannot be justified. Indeed, it is theoretically possible that a contract may be formed which is in accordance with the intention of neither party. If a written contract is entered into, the meaning and effect of the contract depends on the interpretation given the written language by the court.

2 SAMUEL WILLISTON, THE LAW OF CONTRACTS § 6:58, at 711-12 (Richard A. Lord ed., 4th ed. 1990). These latter two passages reflect the situation presented in the instant case, and highlight why Trendwest's argument fails.

■ There is a "core of common meaning" of the terms of the agreement here. Ford promised to undergo mandatory professional treatment for alcohol abuse. Trendwest promised that it would hold Ford's position open during the EAP, and permit Ford to return to work upon successful completion of the program unless previous disciplinary action provided otherwise. At trial, Trendwest asserted it complied with the agreement. The parties did not dispute that in the

EAA, Trendwest promised to hold Ford's position open unless disciplinary action provided otherwise. Instead, they disputed whether or not Trendwest's initial termination of Ford constituted a "disciplinary action" that precluded Ford from returning to Upgrades. This is a question of contract interpretation, not formation.

Indeed, were we to agree with Trendwest's position— particularly in light of the fact that Trendwest had previously offered the same contract to 27 other employees who thereafter agreed to use the company's EAP—then no contract could escape a potential formation challenge. Any contracting party found in breach would argue, as Trendwest did here, that there was never a meeting of the minds as to the nature of the obligation, and the concept of contract interpretation would, in effect, be rendered a nullity.

The trial court did not abuse its discretion in declining to instruct the jury on mutual assent.

Trendwest also contends that the trial court erred in instructing the jury that it could award Ford lost future earnings because of Ford's status as an at-will employee.[5] The trial court instructed the jury as follows:

> With regard to the plaintiff's breach of contract claim, in your determination of damages you are to use the following measures of damages, in the amounts proven by the plaintiff.
>
> Plaintiff would be entitled to recover future lost wages for such period of time as he is able to prove with reasonable certainty is attributable to the breach.

The theory underlying Trendwest's argument is that Trendwest could have discharged Ford lawfully at any time

---

[5] Ford claims that Trendwest waived its right to object because it proposed two of the damages instructions adopted by the court. Trendwest's objection to Ford's more specific proposed instruction on lost future wages, however, is sufficient to defeat Ford's waiver claim. *See Coyle v. Municipality of Metro. Seattle*, 32 Wn. App. 741, 744, 649 P.2d 652 (1982) (party that proposed instruction is not precluded from subsequently urging court not to so instruct). In addition, the damages instructions proposed by Trendwest were not as plaintiff describes them, but rather were merely general damages instructions which made no reference to future wages (or wages of any kind).

if Ford had returned to work under the EAP.

In *Lords v. N. Auto. Corp.*, 75 Wn. App. 589, 881 P.2d 256 (1994), this court permitted the plaintiff to recover front pay damages for handicap discrimination. Although *Lords* is a discrimination case, not a breach of contract case, we see no distinction between the two for purposes of determining what constitutes actual damages in an employment case. The discrimination statutes provide only that plaintiffs in discrimination claims may recover "actual damages," RCW 49.60.030(2), and our courts have determined that "front pay" is a type of actual damage awardable under the statute. *See Lords*, 75 Wn. App. at 604-05. Our courts have further concluded that it is for the jury to decide whether and to what extent an employee is entitled to front pay damages. In *Lords*, this court looked to analogous at-will employment situations for direction:

> Once an employee produces evidence from which a reasonable future employment period may be projected, the amount of front pay, including the likely duration of employment, should go to the jury. In an at-will employment situation, an employee might expect to be employed for "a reasonable future period", although not necessarily until retirement.

*Lords*, 75 Wn. App. at 607 (citations omitted).

Here, Ford presented evidence of a six-year employment history with Trendwest from which the jury could determine the likely duration of future employment. The question is not whether Ford, as an at-will employee, could have been lawfully discharged the next day or at some time thereafter, but whether Ford presented evidence from which the jury could determine the likelihood of his employment tenure absent breach of contract. His at-will employment status is but one factor that bears on that issue.

Trendwest relies on *Bakotich v. Swanson*, 91 Wn. App. 311, 316-17, 957 P.2d 275 (1998), which held that evidence of lost wages was properly excluded on the plaintiff's breach of contract claim because of the at-will nature of his employment contract. *Bakotich* is distinguishable in that,

there, the plaintiff had yet to work for the employer. Here, in contrast, Ford had established an employment history with Trendwest. The remaining cases from other jurisdictions upon which Trendwest relies are distinguishable for the same reason.[6]

The trial court did not err in instructing the jury to decide whether Ford was entitled to lost future earnings. Because the trial court's jury instructions were proper, we affirm the judgment and award of damages for breach of contract. Ford is entitled to attorney fees and costs pursuant to RCW 49.48.030 and RAP 18.1.

AGID, C.J., and GROSSE, J., concur.

Reconsideration denied November 8, 2000.

Review granted at 143 Wn.2d 1026 (2001).

---

[6] Indeed, we believe the holding in *Bakotich* may be overstated, since the logical basis for the holding is that, in the absence of some evidence from which to project the future employment relationship, the plaintiff was unable to create a jury question on future wages. *See Bakotich*, 91 Wn. App. at 316-17 ("[A]ny lost wages or benefits were highly speculative and properly excluded by the trial court." (citations omitted)). While most at-will preemployment cases may resemble *Bakotich*, we are unwilling to rule out the possibility of preemployment circumstances which would provide a jury with a nonspeculative basis for assessing actual damages in the form of lost future wages.