[No. 7611–3–III.   Division Three.   June 9, 1987.]

BASIN PAVING, INC., *Appellant,* v. PORT OF MOSES LAKE, *Respondent.*

*Patrick Andreotti, Charles C. Flower,* and *Flower & Andreotti,* for appellant.

*Harry E. Ries* and *Ries & Kenison,* for respondent.

McINTURFF, C.J.—Basin Paving, Inc. brought an action alleging the Port of Moses Lake owed it $70,000 on a contract. The Port counterclaimed for the return of that same amount of money, alleging it had overpaid Basin on a previous contract. In its answer, Basin stated the parties had agreed, in the settlement of a dispute arising out of the first

contract, that Basin should retain all payments made by the Port to Basin prior to that date. The Superior Court found, *inter alia,* the Port was not aware of the $70,000 overpayment at the time it entered into the settlement and this unilateral mistake was induced by inequitable conduct on the part of Basin. Thus, the court reformed a general release executed by the parties in their settlement to indicate that the $70,000 overpayment was not included in its terms. Basin's appeal assigns error to these and others of the court's findings and conclusions. We affirm.

In 1983, Basin entered into a contract with the Port of Moses Lake to repair one of the Port's runways. By mid-September 1983, it was apparent the work would require about 37,000 tons of asphalt instead of the 47,000 tons the Port had listed in the specifications. Basin notified the Port of the underrun and of its probable claim for damages on October 24, 1983, and in March 1984 it submitted a written claim for $89,885 to the Port and to CH2M Hill, the consulting engineer for the project. Witnesses for Basin testified this amount represented the incidental costs it had apportioned in its bid to the 10,000-ton underrun. These witnesses further stated lost profits were not included in this claim.

Meanwhile, Basin had performed work under the contract throughout the summer and fall of 1983. The Port paid Basin progress payments during the course of this work. Eric Cutbirth, the project engineer for CH2M Hill, and Larry McAtee, the project coordinator for Basin, initiated such payments by meeting and agreeing on the percentage of work performed to date and then submitting a payment application for a given amount to the Port's commissioners for their approval. Once approved, a voucher was issued.

The first payment application was for $180,886.41 and was approved and paid on October 12, 1983. The second application was for $922,333.68, and the commissioners approved that amount on October 21, 1983. However, in preparing the voucher for payment two, the Port's book-

keeper made a typographical error. She made the voucher for $992,333.68 instead of $922,333.68. Basin accepted the check, and in its bookkeeping listed the entire amount as received "on account". Mr. Albert DeAtley, president of Basin, testified he was aware of the overpayment by late fall 1983, or early 1984, but Basin retained the money because more than that sum was still owing under the contract.

Subsequently, two other payment applications were approved and paid by the Port: $150,438.24 in February 1984, and $4,387.42 in April 1984. These applications and their vouchers reflected a $922,000, rather than $992,000, payment on the total–paid–to–date lines. Mr. McAtee, of Basin, Mr. Cutbirth, of CH2M Hill and David Bailey, a manager for the Port, testified they were not aware of the overpayment during this time.

Negotiations of Basin's underrun claim continued throughout the winter, spring and summer of 1984. Mr. Cutbirth testified that in May 1984, Basin offered to settle for $35,000, and the Port countered for $13,000. Basin's witnesses did not contradict these figures. However, testimony concerning who handled the negotiations varied. Eric Cutbirth stated that Lawrence McAtee was the one principally involved on behalf of Basin, but he also testified they reached an impasse in September 1984 and referred the matter to the parties' attorneys. Mr. DeAtley contended that in the final negotiations he and Basin's attorneys were the only people involved for Basin.

In October and November 1984, Alan DeAtley, of Basin, James Correll, of CH2M Hill, and Mr. Bailey, for the Port, signed a settlement and release disposing of Basin's claim. The release recited that a dispute existed concerning Basin's claim for damages in excess of $150,000. (The difference between the March 1984 claim for some $89,000 in damages and this $150,000 figure apparently is attributable to an added claim by Basin for lost profits.) The release then provided:

Now, therefore, in consideration of *all Port's past payments to Basin* plus payment of $66,268.67 retainage and an extra payment by Port to Basin of $20,500.00 because of Basin's claim and other valuable consideration, Port accepts Basin's 1983 material supplied and work performed and Basin unconditionally forever releases and discharges the Port and CH2M–Hill from all claims . . .

Further, *the Port unconditionally forever releases and discharges Basin from all claims* of every kind whatsoever, now *known or unknown,* . . .

(Italics ours.)

Mr. Bailey said that on November 29, 1984, in the course of a final audit of the job, the Port for the first time discovered the overpayment. When it contacted Basin, Mr. DeAtley advised that Basin considered the $70,000 to be part of the settlement on the underrun. On January 5, 1985, Basin's bookkeeping showed the $70,000 as applied to the settlement.

In 1984, Basin had entered into a second contract to perform other work for the Port. In its final payment on that contract, the Port withheld the $70,000, which it viewed as an overpayment on the first contract. As a result, Basin brought this action. The Port counterclaimed, alleging the overpayment and a right of setoff, and Basin replied, asserting the release as a defense.

Following a bench trial, the court issued a memorandum opinion which held that the parties' release should be reformed. The court found Mr. McAtee had negotiated the settlement on behalf of Basin, and since neither he nor the Port was aware of the overpayment at that time, a mutual mistake existed. In the alternative, the court held reformation was mandated by the Port's unilateral mistake coupled with Mr. DeAtley's failure to disclose. The court viewed Mr. DeAtley's conduct as (1) inequitable, (2) a breach of the contracting party's duty to deal in good faith, (3) unconscionable, and (4) a breach of a fiduciary duty flowing from Basin's position as a constructive trustee of the $70,000.

Basin's appeal assigns error to several of the findings and

conclusions formulated from the Superior Court's memorandum opinion.

First, did the court err when it relieved the Port of its obligation under the terms of the release? We note that a release which by its terms is clear and unambiguous will not be overturned short of "fraud, false representation, overreaching or a mutual mistake of which the evidence is clear and convincing." *Metropolitan Life Ins. Co. v. Ritz,* 70 Wn.2d 317, 321, 422 P.2d 780 (1967). Basin argues there was no such evidence in this case. We disagree.

Here, the Superior Court in its memorandum opinion[1] found that Basin knew or should have known the Port was unaware of the overpayment and did not intend it to be applied to the settlement. This finding is supported by substantial evidence; *i.e.,* the $70,000 was received by Basin long before the Port would reasonably make a payment on the underrun claim; the February and April 1984 payment applications and vouchers showed a total for past payments that did not include the $70,000, and the $70,000 was never referred to in the settlement negotiations, which revolved around much lower offers and counteroffers.[2] We hold that because Basin, in negotiating the settlement, knew the Port was unaware of the overpayment, it had a duty to inform the Port of this fact if it expected to avail itself of the $70,000 under the terms of the release. *Cf. Barry v. Lewis,* 259 A.D. 496, 20 N.Y.S.2d 88, 90 (1940) (defendant's insurance adjuster had duty to inform plaintiff release contained clause releasing defendant from liability

---

[1]A trial court's findings may be supplemented or clarified by its oral opinion or other statement on the record. *In re LaBelle,* 107 Wn.2d 196, 219, 728 P.2d 138 (1986); *Goodman v. Darden, Doman & Stafford Assocs.,* 100 Wn.2d 476, 481, 670 P.2d 648 (1983).

[2]Basin makes much of the fact the October 1983 payment application and voucher were available to the Port. It implies that the Port must have had actual knowledge of the typographical error because the error is obvious on the face of the documents. This argument ignores the other substantial evidence, listed in the body of this opinion that the Port was unaware of the overpayment. We have held this other evidence supports the court's holding overturning the release.

for unknown injuries when he knew plaintiff was unaware of the provision). Its conduct in failing to do so constitutes false representation and overreaching and, thus, the release must be overturned.[3]

Our holding is supported by analogy to the rule applied in *Snap–On Tools Corp. v. Roberts,* 35 Wn. App. 32, 35, 665 P.2d 417 (1983) (citing, *inter alia, Appleway Leasing, Inc. v. Tomlinson Dairy Farms, Inc.,* 22 Wn. App. 781, 784, 591 P.2d 1220 (1979); *Puget Sound Nat'l Bank v. Selivanoff,* 9 Wn. App. 676, 681, 514 P.2d 175 (1973)). There, the courts held that a unilateral mistake may be grounds for relieving a party from a contract if the other party knows or is charged with knowing of the mistake.

Thus, the court in *Roberts* reversed a summary judgment, holding that issues of material fact existed as to whether the defendant knew or should have known that the corporate plaintiff had mistakenly overpaid him, under the terms of a dealership termination agreement, more than $4,000 for his inventory. In *Buck v. Equitable Life Assur. Soc'y,* 96 Wash. 683, 165 P. 878 (1917), the court refused to enforce a life insurance contract, as written, because the insurance company's agent had made a unilateral mistake when he filled in the amount of the policy's cash reserve. The court found that the policyholder knew of the mistake but did not inform the agent of it.[4] While these cases did not concern releases, their rationale is no less applicable in the release context. Parties cannot benefit from such inequitable conduct.

Second, did the court err when it reformed the release? ▮ Basin correctly points out that "[r]eformation is an

---

[3]Our holding makes it unnecessary to address Basin's assignments of error relating to mutual mistake, duty of good faith, and constructive trust.

[4]Basin cites several cases in which the courts refused to relieve the plaintiffs of the effect of a unilateral mistake. But in those cases, the defendants were not charged with knowledge of plaintiff's mistake. *See, e.g., Bakamus v. Albert,* 1 Wn.2d 241, 251, 95 P.2d 767 (1939); *Lincoln v. Keene,* 51 Wn.2d 171, 174, 316 P.2d 899 (1957).

equitable remedy which permits the court to correct errors and thereby make an instrument truly express the real intention of the parties thereto." *J.J. Welcome & Sons Constr. Co. v. State,* 6 Wn. App. 985, 988, 497 P.2d 953 (1972). Since Mr. DeAtley testified he would not have approved the settlement if the $70,000 was not included, Basin argues that reformation of the release to exclude the $70,000 would not reflect both parties' intent.

Basin's analysis does not take into consideration the oft–cited rule that

> "In order to entitle a party to a contract to a reformation thereof based upon mistake of fact there must have been either a mutual mistake of the parties, or a mistake on the part of the one entrusted with reducing the contract to writing . . ., *or a mistake on the part of one party and fraud or inequitable conduct on the part of the other party.*"

(Citations omitted. Italics ours.) *Gammel v. Diethelm,* 59 Wn.2d 504, 507, 368 P.2d 718 (1962) (quoting *Kaufmann v. Woodard,* 24 Wn.2d 264, 270, 163 P.2d 606 (1945)). *See also Mitchell Int'l Enters. v. Daly,* 33 Wn. App. 562, 565, 656 P.2d 1113, *review denied,* 99 Wn.2d 1021 (1983); *Rolph v. McGowan,* 20 Wn. App. 251, 255, 579 P.2d 1011, *review denied,* 91 Wn.2d 1004 (1978).

We have already held the record supports the court's findings regarding the Port's mistake and Basin's inequitable conduct. We now hold Basin's failure to disclose the overpayment was an implied representation that the overpayment was *not* part of the settlement. Thus, the Superior Court properly reformed the release to reflect this implied representation.

Finally, did the court err in entering the judgment as follows:

> It is hereby ordered, adjudged and decreed that the plaintiff, Basin Paving, Inc., recover nothing by way of its claim and plaintiff's claim is hereby granted dismissed with prejudice.
> It is further ordered that defendant, Port of Moses

Lake, recover nothing by way of its counterclaim and the counterclaim is hereby dismissed with prejudice.

By handling the claim and counterclaim in this manner, the Superior Court prejudiced the Port, if anyone. If, instead, it had entered a judgment of $70,000 for Basin on the second contract and a judgment of $70,000 for the Port on the counterclaim, then prejudgment interest would also be owing. Since the Port's overpayment predated its liability on the second contract, the Port's judgment would have accumulated more interest than Basin's. Hence, we conclude that the error, if any, did not affect Basin.

The judgment of the Superior Court is affirmed.[5]

GREEN and THOMPSON, JJ., concur.

---

[5]Basin's request for attorney fees on appeal is denied.