IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| G. STEVEN HAMMOND, M.D., | ) | No. 80772-2-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE EVERETT CLINIC, PLLC, | ) | UNPUBLISHED OPINION |
| f/k/a THE EVERETT CLINIC, P.S., | ) | |
| a limited liability corporation, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

VERELLEN, J. — A party is bound by the contract he knowingly and voluntarily signs. Dr. G. Steven Hammond argues the litigation release he signed should be avoided because he was misled into signing it. Because Hammond fails to establish any misrepresentation or that his reliance on the alleged misrepresentation was reasonable, the trial court did not err by concluding the release barred his claims.

Hammond contends the court abused its discretion when it denied a motion to amend his complaint to add a misrepresentation claim under the Securities Act of Washington, chapter 21.20 RCW. Because Hammond fails to establish any misrepresentation occurred, the court did not abuse its discretion by denying the motion as futile.

Therefore, we affirm.

FACTS

For many years, The Everett Clinic's (TEC) Buy-Sell Agreement with its physicians required that they purchase shares of stock in the company and hold the shares while employed. When a physician left, TEC would buy the shares back at their original purchase price. The Buy-Sell Agreement also imposed an ongoing duty for the next 15 years on TEC to the former physician-shareholder. If "all of the outstanding stock of [TEC] is sold to one or more third parties and any one or more related transactions," then TEC would distribute part of the proceeds to the former shareholder equal with current shareholders.[1]

In 2015, TEC and DaVita HealthCare Partners, Inc., decided to merge. TEC's board of directors sent its former shareholders a letter notifying them of the transaction. A current shareholder could be entitled to $1,000,000. But for former shareholders, "it is the Board's assessment" that the transaction would not trigger TEC's duty to share the proceeds "[b]ecause a merger is neither a dissolution nor a sale of stock."[2] However, because "opinions on the application of the Buy-Sell Agreement may differ with respect to the merger transaction," TEC offered to pay each former shareholder $350,000 in exchange for signing a litigation release "from any and all claims . . . arising under the Buy-Sell Agreement."[3]

---

[1] Clerk's Papers (CP) at 124.

[2] CP at 368.

[3] CP at 501-02.

Hammond worked for TEC until he left in 2004.  In December of 2015, he received the letter and an enclosed packet of information—the release agreement, a copy of the Buy-Sell Agreement, and a detailed merger summary—read them several times; discussed them with his wife, an attorney, and a physician still employed by TEC; and decided to sign the release.  Hammond received $350,000 from TEC and invested it.

In April of 2017, a group of former shareholders who had decided against signing the release won in arbitration against TEC.  The arbitrator concluded the merger with DaVita triggered TEC's duty to share the proceeds pursuant to the Buy-Sell Agreement and awarded the group just over $30,000,000, or about $1,000,000 each.  Because of their success, Hammond decided TEC had misled him about the nature of its transaction with DaVita and filed a complaint alleging breach of the Buy-Sell Agreement and seeking to void the release agreement.

As litigation progressed, Hammond amended his complaint and moved to do so for a third time.  He also moved for partial summary judgment.  TEC moved for summary judgment on all claims on the basis of Hammond's signed release and opposed the third motion to amend, arguing it was futile.  The court agreed with TEC, granted its motion for summary judgment, denied Hammond's motion for partial summary judgment as moot, and denied his third motion to amend as futile.  The court awarded TEC attorney fees and costs.

Hammond appeals.

3

ANALYSIS

I.  Summary Judgment

We review a grant of summary judgment de novo, engaging in the same inquiry as the trial court.[4]  Summary judgment is appropriate when there are no issues of material fact and the movant is entitled to judgment as a matter of law.[5]  All facts and inferences are viewed in a light most favorable to the nonmoving party.[6]  We can affirm on any ground supported by the record.[7]

Hammond argues he should be allowed to avoid the release because TEC misrepresented the nature of its transaction with DaVita by calling it a "merger" when "the end result (to the trained eye) was still a stock sale."[8]  As explained in his motion for partial summary judgment, "[TEC] failed to inform Plaintiffs the substance of the DaVita transaction was a sale of stock, not simply a merger, and therefore, contrary to the assertions in [TEC's] letter, the Buy-Sell Agreement did apply."[9]

---

[4] Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011) (citing Harris v. Ski Park Farms, Inc., 120 Wn.2d 727, 737, 844 P.2d 1006 (1993); RAP 9.12).

[5] Washington Fed. Sav. & Loan Ass'n v. Alsager, 165 Wn. App. 10, 13, 266 P.3d 905 (2011) (citing CR 56(c)).

[6] Id. (citing Schaaf v. Highfield, 127 Wn.2d 17, 21, 896 P.2d 665 (1995)).

[7] Id. at 14 (citing King County v. Seawest Inv. Assoc., LLC, 141 Wn. App. 304, 310, 170 P.3d 53 (2007)).

[8] Appellant's Br. at 23.

[9] CP at 302.

"The whole panoply of contract law rests on the principle that one is bound by the contract which he voluntarily and knowingly signs."[10] Releases are contracts and are governed by the same rules.[11] If one party enters a contract due to the other's misrepresentation, then the contract can be voidable.[12] The party seeking to avoid the contract must prove (1) he agreed to the contract due to the other party's misrepresentation, (2) the assertion was fraudulent or material, and (3) he reasonably relied upon the misrepresentation.[13]

A "misrepresentation" is an assertion of fact that is false under the circumstances.[14] A misleading factual assertion can be made by an affirmative factual representation, an omission, or a statement of opinion.[15]

---

[10] Skagit State Bank v. Rasmussen, 109 Wn.2d 377, 381, 745 P.2d 37 (1987) (quoting Nat'l Bank of Wash. v. Equity Inv., 81 Wn.2d 886, 912-13, 506 P.2d 20 (1973)).

[11] See Del Rosario v. Del Rosario, 152 Wn.2d 375, 382, 97 P.3d 11 (2004) (explaining personal injury releases are interpreted as contracts) (citing Beaver v. Estate of Harris, 67 Wn.2d 621, 627-28, 409 P.2d 143 (1965)).

[12] Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wn.2d 371, 390, 858 P.2d 245 (1993) (citing Skagit State Bank, 109 Wn.2d at 384; RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981)).

[13] Brinkerhoff v. Campbell, 99 Wn. App. 692, 697, 994 P.2d 911 (2000) (citing Fire Prot. Dist., 122 Wn.2d at 390).

[14] Restatement (Second) of Contracts § 159 cmt. a; see Fire Prot. Dist., 122 Wn.2d at 390 ("A misrepresentation is 'an assertion that is not in accord with the facts.'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 159)).

[15] See Skagit State Bank, 109 Wn.2d at 384 (explaining when an affirmative misrepresentation of fact can allow avoidance); Brinkerhoff, 99 Wn. App. at 698 (explaining misrepresentations can be made by omission); RESTATEMENT (SECOND) OF CONTRACTS § 168 (explaining misrepresentations can be made by statements of opinion).

Hammond asserts TEC's letter made affirmative misrepresentations by describing a reverse triangular merger when TEC's transaction with DaVita was actually an acquisition. A reverse triangular merger is a "merger in which the acquiring corporation's subsidiary is absorbed into the target corporation, which becomes a new subsidiary of the acquiring corporation."[16] TEC's letter described the proposed merger:

> [A] subsidiary of a newly formed Washington professional services corporation will merge with and into TEC, with TEC being the surviving corporation in the merger. As a result of this merger, the newly formed professional services corporation (the "Company") will own 100% of the shares in TEC (making the Company the sole shareholder of TEC), the shares held by the current TEC shareholders will be extinguished, and initially the TEC shareholders will receive non-voting shares in the Company. This merger will be followed by a complex series of steps transferring the non-practice assets of TEC to the Company, converting TEC into a professional limited liability company and, upon the closing of a subsequent merger, making the Company a wholly-owned subsidiary of DaVita. . . .
>
> Upon closing of the subsequent merger between the DaVita subsidiary and the Company, we anticipate payment of merger proceeds will be made to the current TEC shareholders in exchange for their Company stock received in the initial merger.[17]

The merger summary attached to the letter described the transaction in more detail.

Both the letter and merger summary use plain English to describe a reverse triangular merger resulting in DaVita acquiring TEC. The documents explain how 100 percent of the shares in TEC would change ownership to a newly formed

---

[16] BLACK'S LAW DICTIONARY 1185 (11th ed. 2019).

[17] CP at 367-68.

6

company, and DaVita would gain possession of those shares when the newly formed company merged with a DaVita subsidiary. The merger summary explains that DaVita would pay around $385 million in consideration for TEC and that each of the current shareholders would be entitled to approximately $800,000 to $1,000,000 of the proceeds. Hammond provides no evidence to show this transaction did not occur or that it occurred differently than described. TEC did not affirmatively misrepresent the facts of its transaction.

Hammond also argues TEC misrepresented its transaction by omitting TEC and DaVita's communications and internal deliberations about the deal. An omission amounts to a misleading assertion of fact when the speaker knows revealing the information will prevent a mistaken belief by the other party or will prevent a previous factual statement from becoming a material or fraudulent misrepresentation.[18] A contracting party also has an obligation to disclose information when it has a "relation of trust and confidence" with the other.[19]

---

[18] RESTATEMENT (SECOND) OF CONTRACTS § 161(a)-(c); see Brinkerhoff, 99 Wn. App. at 698 (an omission "is equivalent to an assertion that the fact does not exist 'where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract'") (quoting Mitchell v. Straith, 40 Wn. App. 405, 410-11, 698 P.2d 609 (1985)).

[19] RESTATEMENT (SECOND) OF CONTRACTS § 161(d); see Basin Paving, Inc. v. Port of Moses Lake, 48 Wn. App. 180, 184, 737 P.2d 1312 (1987) (when negotiating a release, the paving company had an obligation to disclose the port's accidental overpayment from an earlier contract). Assuming that Basin Paving stands for the proposition that the duties of good faith and fair dealing alone compelled TEC to disclose additional information, as discussed below, Hammond fails to show those disclosures would have been material or prevented fraud.

Hammond also asserts a genuine issue of material fact exists about whether TEC owed him duties as a fiduciary. He relies upon his proffered corporate law expert, attorney Scott Milburn, to assert this poses a genuine issue

Whether characterized as a merger or acquisition, TEC accurately described its proposed transaction with DaVita. Hammond fails to explain how providing additional details about, for example, TEC's efforts to refer to the transaction as a "merger" rather than an "acquisition," would have changed the accuracy of TEC's description of its impending transaction with DaVita. Providing additional details about TEC's reason for holding back between $75.5 million and $136 million "to satisfy . . . any claims that may be asserted by former shareholders,"[20] would also have not changed the accuracy of TEC's portrayal of its transaction with DaVita. Because revealing the allegedly omitted facts would not have materially changed the facts disclosed, Hammond fails to establish an omission by TEC caused a material misrepresentation or fraud.[21] Thus, Hammond's real argument is that TEC misled him by asserting former

---

of material fact. See, e.g., Appellant's Br. at 35 ("Here, at a minimum there was a genuine issue of material fact whether TEC breached these [fiduciary] duties to Dr. Hammond. After all, expert Milburn opined that TEC did."). Although Hammond's proffered expert opined, for example, TEC's "fundamental misrepresentation of the transaction constitute[d] a breach of the contractual duty of good faith and fair dealing," CP at 1194, experts' legal opinions on the ultimate legal issues before the court are inadmissible and not considered as evidence on summary judgment. King County Fire Prot. Dists. No. 16, No. 36 & No. 40 v. Hous. Auth. of King County, 123 Wn.2d 819, 826, 872 P.2d 516 (1994) (citing Wash. State Physicians Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 344, 858 P.2d 1054 (1993); Dunlap v. Wayne, 105 Wn.2d 529, 535, 716 P.2d 842 (1986)).

[20] CP at 374.

[21] See Kaas v. Privette, 12 Wn. App. 142, 149, 529 P.2d 23 (1974) (omitting facts "vital and material to a transaction" can make a contract voidable) (citing Sorrell v. Young, 6 Wn. App. 220, 491 P.2d 1312 (1971)).

shareholders would have no right to share in the merger's proceeds under the Buy-Sell Agreement.[22]

TEC's letter asserted that "[b]ecause a merger is neither a dissolution nor a sale of stock, it is the Board's assessment that those provisions of the Buy-Sell Agreement are not applicable and there are no payment rights for former shareholders."[23] TEC argues the allegedly misleading statement in the letter was merely a legal opinion surrounded by accurate facts.

When an opinion creates a misleading impression by implying the existence of facts reasonably known to the speaker but unknown or undisclosed to the listener, the opinion can amount to a misleading factual assertion.[24] A legal opinion can be misleading under the same circumstances.[25] But a legal opinion is not misleading when limited to "the legal consequences of a state of facts" without commenting on the facts themselves.[26] Thus, the question is whether TEC's

---

[22] Significantly, Hammond admitted in an interrogatory that the only alleged misrepresentation inducing him to sign the release was TEC telling former shareholders "that the transaction was a 'merger,' and that because it was a 'merger,' the payout provisions for our stock ownership under the Buy-Sell [A]greement did not apply." CP at 548. In both another interrogatory, CP at 531, and a deposition, CP at 427-28, Hammond confirmed the only alleged misrepresentation that caused him to sign was TEC's assertion that its merger with DaVita did not require paying former shareholders.

[23] CP at 368.

[24] RESTATEMENT (SECOND) OF CONTRACTS § 168 cmt. d.

[25] See RESTATEMENT (SECOND) OF CONTRACTS § 170 (legal opinions are analyzed under the same rules as other opinions).

[26] RESTATEMENT (SECOND) OF CONTRACTS § 170 cmt. b.

assertion about the Buy-Sell Agreement being inapplicable was mere opinion or a misleading factual assertion.

Hammond does not dispute that the Buy-Sell Agreement conditioned TEC's obligation to pay stock sale proceeds to former shareholders in "the event that all of the outstanding stock of [TEC] is sold to one or more third parties and any one or more related transactions."[27] TEC concluded its reverse triangular merger with DaVita did not satisfy this condition, so it had no obligation to pay former shareholders. TEC's statement was a mere legal opinion because its assertions were limited to the effect of the merger on the Buy-Sell Agreement and did not comment implicitly or explicitly on the facts of the merger. Although Hammond disputes what the legal effect of TEC's merger with DaVita should have been, he does not show the substance of TEC's merger with DaVita differed from the transaction described in the letter.[28] Because TEC's assertion was limited to a legal opinion, it was not a factual misrepresentation. Hammond fails to show TEC's letter contained misrepresentations of fact.

---

[27] CP at 385.

[28] Hammond asserts that TEC's opinion misstated facts because, for example, TEC's board president "knew that the transaction was designed to obtain an equity payment for current shareholders in exchange for their shares of stock." Reply Br. at 13 (citing CP at 1161). But this fact was disclosed to Hammond in TEC's letter and the attached materials. CP at 368, 373. He also asserts TEC's opinion was misleading because it "was loath to acknowledge the transaction was an acquisition of TEC stock." Reply Br. at 14. Even if TEC had characterized its transaction with DaVita differently, that characterization would not have changed the structure of the transaction itself, which TEC's letter described in detail. Hammond fails to demonstrate a material fact, as opposed to an opinion, about the merger that was obscured by TEC's legal opinion.

Even assuming TEC's legal opinion was an actionable misrepresentation, Hammond fails to show his reliance on it was reasonable. A party seeking avoidance of a contract must prove his reliance on the misrepresentation was reasonable.[29] Whether a party's reliance was reasonable depends upon the circumstances.[30]

In Skagit State Bank v. Rasmussen, the Supreme Court concluded a farmer was bound by a mortgage contract he signed as a guarantor.[31] The farmer signed the contract without reading it, relying instead on his "long-time close friend and business partner" to describe the contract's legal effect.[32] The contract stated that each signatory's property could be taken to repay the loan in the event of a default.[33] The court concluded the farmer's reliance on his friend was not reasonable.[34] Their friendship and former business relationship "alone d[id] not justify [the farmer's] reliance."[35] The farmer's reliance was also not reasonable because, among other reasons, he knew his friend was a borrower on the loan.[36]

---

[29] Skagit State Bank, 109 Wn.2d at 384 (citing RESTATEMENT (SECOND) OF CONTRACTS § 164(1)).

[30] Id.

[31] 109 Wn.2d 377, 378, 745 P.2d 37 (1987).

[32] Id. at 385.

[33] Id. at 383.

[34] Id. at 386.

[35] Id. at 385.

[36] Id. at 386.

Here, Hammond read the letter from TEC and its accompanying materials, including the release, "several times."[37]  He spoke with an attorney for legal advice about the entire packet of materials.  He spoke with a physician at TEC to discuss the impending merger, the proposed release, and the $350,000 offer.  The physician told Hammond a group of former shareholders were going to challenge the release.  Hammond also knew current TEC shareholders had a financial interest in completing the transaction because the letter told him current shareholders could receive around $1,000,000 from the merger.  TEC itself warned Hammond its assertion about the Buy-Sell Agreement was "the Board's assessment" and that "opinions on the application of the Buy-Sell Agreement may differ with respect to the merger transactions."[38]

Like Skagit State Bank, Hammond knew the entity opining about the transaction had a financial interest adverse to his own.  Unlike Skagit State Bank, Hammond did not have a longstanding friendly relationship with TEC, TEC warned Hammond it was providing an opinion with which former shareholders could disagree, and Hammond knew other former shareholders actually disagreed.  Because the circumstances show Hammond had ample warning that the allegedly misleading opinion should not be relied upon, his reliance on it was not reasonable.

---

[37] CP at 409-10.

[38] CP at 368-69.

Hammond fails to show the trial court erred by upholding the release and granting summary judgment for TEC. Necessarily, the court also did not err by denying Hammond's motion for partial summary judgment on the same topic as moot.[39]

II. Motion to Amend

Hammond moved to amend his complaint by adding a claim under RCW 21.20.010 of the Securities Act of Washington. The court denied his motion as futile.

We review denial of a motion to amend for abuse of discretion.[40] A court abuses its discretion where its decision rests on untenable grounds or was made for untenable reasons.[41] A trial court does not abuse its discretion by denying a motion to add a futile claim.[42]

To establish a prima facie claim under RCW 21.20.010, a plaintiff must demonstrate, at least, "'(1) a fraudulent or deceitful act committed (2) in connection

---

[39] See Orwick v. City of Seattle, 103 Wn.2d 249, 253, 692 P.2d 793 (1984) ("A case is moot if a court can no longer provide effective relief.") (citing State v. Turner, 98 Wn.2d 731, 733, 658 P.2d 658; In re Cross, 99 Wn.2d 373, 377, 662 P.2d 828 (1983)).

[40] Wilson v. Horsley, 137 Wn.2d 500, 505, 974 P.2d 316 (1999) (citing Sprague v. Sumitomo Forestry Co., 104 Wn.2d 751, 763, 709 P.2d 1200 (1985); Lincoln v. Transamerica Inv. Corp., 89 Wn.2d 571, 577, 573 P.2d 1316 (1978)).

[41] Id. (citing State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

[42] Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 142, 937 P.2d 154 (1997) (citing MacLean v. First Nw. Indus. of Am., Inc., 96 Wn.2d 338, 345, 635 P.2d 683 (1981); Doyle v. Planned Parenthood of Seattle-King County, Inc., 31 Wn. App. 126, 131, 639 P.2d 240 (1982)).

13

with the offer, sale or purchase of any security.'"[43]  Hammond's proposed claim

alleged TEC "deceived and misled Plaintiffs into believing that the transaction with

DaVita did not represent the sale of TEC common[ ] stock, and that their

respective Buy-Sell Agreements were inapplicable" when "the transaction with

DaVita had, as its central purpose, the complete acquisition by DaVita of 100% of

TEC common stock, and the Buy-Sell Agreement was fully applicable."[44]

Hammond sought to avoid the release on the basis that TEC misrepresented its

transaction with DaVita as a merger and misrepresented its duty to share the

proceeds under the Buy-Sell Agreement.

There can be some nuances between securities fraud claims of

misrepresentation under RCW 21.20.010 and claims to avoid a contract due to

misrepresentation, but none of those nuances apply to the misrepresentations

alleged by Hammond.  Hammond alleged the same misrepresentation as the

basis for his contract and Securities Act claims.  Because, as discussed, TEC did

not mislead Hammond about its transaction with DaVita, adding this claim would

have been futile.[45]  The court did not abuse its discretion.[46]

---

[43] Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, 194 Wn.2d 253, 267, 449 P.3d 1019 (2019) (internal quotation marks and emphasis omitted) (quoting Kinney v. Cook, 159 Wn.2d 837, 842, 154 P.3d 206 (2007)).

[44] CP at 293.

[45] See Colvin v. Inslee, 195 Wn.2d 879, 901, 467 P.3d 953 (2020) (affirming denial of a motion to amend a personal restraint petition as futile when the plaintiffs failed to demonstrate they were unlawfully restrained).

[46] For the first time on appeal, Hammond argues the release should be declared void due to overreach.  The record does not show evidence TEC took unfair advantage of Hammond.  TEC did not misrepresent the nature of its

III.  Attorney Fees

Hammond asks us to reverse the trial court's award of attorney fees only in the event he prevails on appeal.  He does not challenge the basis of the court's decision.  Because he has not prevailed, we do not reverse the trial court's award.

TEC requests attorney fees from this appeal and argues it is entitled to fees under section II.6 of the release agreement.  Attorney fees may be awarded pursuant to a contract.[47]  Whether a contract authorizes an award of fees is a question of law we consider de novo.[48]

Section II.6 of the release governs dispute resolution and provides:

[A]ny and all disputes arising out of [or] related to this Agreement shall be resolved in arbitration . . . . In the event there is a disagreement regarding the interpretation, implementation, and/or enforcement of this Agreement that is subsequently resolved in arbitration, the substantially prevailing party shall be awarded reasonable attorneys' fees, arbitrator fees, costs and expenses.[49]

The provision's plain language authorizes an award of attorney fees from disputes resolved in arbitration.  This is an appeal from a judicial proceeding, and the parties did not arbitrate any of their dispute.  TEC provides no authority that a fee provision limited to arbitration has any application to this proceeding.  Because the

---

transaction, and it allowed sufficient time for Hammond to read the letter and enclosed materials several times and to discuss them with an attorney.

[47] Deep Water Brewing, LLC v. Fairway Res. Ltd., 152 Wn. App. 229, 277, 215 P.3d 990 (2009) (citing Fisher Props., Inc. v. Arden-Mayfair, Inc., 106 Wn.2d 826, 849-50, 726 P.2d 8 (1986)).

[48] Tradewell Grp., Inc. v. Mavis, 71 Wn. App. 120, 126, 857 P.2d 1053 (1993).

[49] CP at 503 (emphasis added).

plain language of the release agreement is inapplicable and TEC provides no other basis for attorney fees, we deny TEC's request for attorney fees from this appeal.

Therefore, we affirm.

WE CONCUR: