# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KAISER FOUNDATION HEALTH PLAN, INC., d/b/a KAISER FOUNDATION HEALTH PLAN, f/n/a GROUP HEALTH COOPERATIVE, | No. 55585-9-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| KENNETH MAYLONE and JANE DOE MAYLONE, and the marital community comprised thereof, | |
| Appellants. | |

PRICE, J. — Kaiser Foundation Health Plan filed a claim for declaratory relief, arguing that it was entitled under its policy to reimbursement of the proceeds its insured, Kenneth Maylone, was to receive from his underinsured motorist (UIM) policy carrier, Hartford Casualty Insurance Company.

Maylone was severely injured in an accident with a hit-and-run driver. Kaiser paid Maylone's extensive medical expenses resulting from the accident. When Maylone settled with the Hartford for his UIM policy limits, Kaiser argued it was entitled to reimbursement from the settlement. According to Kaiser, this right to reimbursement was provided under its policy language as required by the Federal Employees' Health Benefits Act (FEHBA), 5 U.S.C. §§ 8901 to 8917. Because federal law requires the right to reimbursement, Kaiser asserted that Washington

law that would otherwise prevent reimbursement unless and until Maylone was made whole for his injuries was preempted. Accordingly, Kaiser instructed the Hartford to make the settlement check jointly payable to Maylone and Kaiser. Maylone objected to Kaiser's reimbursement and, thereafter, attempted to return the settlement check to the Hartford and rescind the settlement.

After Kaiser filed its declaratory judgment action seeking the proceeds of the settlement, Maylone responded by arguing: (1) FEHBA does not preempt Washington law that would operate to prevent Kaiser from exercising its right to reimbursement, (2) the contract provision giving Kaiser the right to reimbursement is unconscionable, (3) Kaiser tortuously interfered with his UIM insurance contract and settlement agreement with the Hartford, and (4) he never effectively received settlement proceeds from the Hartford, and he rescinded the settlement agreement, which means Kaiser's right to reimbursement was never triggered. The superior court granted summary judgment in favor of Kaiser. Maylone appeals.

We hold that because FEHBA's right to reimbursement preempts state law, Kaiser has a right to reimbursement from Maylone for UIM proceeds. We also hold that Kaiser's policy was not unconscionable and Kaiser is not liable for tortious interference with a contract. However, we determine that Maylone never received settlement proceeds from the Hartford and that there is a genuine issue of material fact as to whether the settlement agreement was effectively rescinded. Accordingly, we reverse the superior court's entry of summary judgment for Kaiser and remand to the superior court for further proceedings consistent with this opinion.

FACTS

I. BACKGROUND

Maylone sustained severe injuries in a car accident caused by an individual who was never located. Maylone's health insurance, provided by Kaiser, paid a total of $157,265.92 in medical expenses for Maylone related to the car accident.

Kaiser's health insurance policy provided that it had a right to subrogation and reimbursement in any proceeds Maylone received:

> Our right to pursue and receive subrogation and reimbursement recoveries *is a condition of, and a limitation on,* the nature of benefits or benefit payments and on the provision of benefits under our coverage.
>
> If you have received benefits or benefit payments as a result of an injury or illness and you or your representatives, heirs, administrators, successors, or assignees receive payment from any party that may be liable, a third party's insurance policies, your own insurance policies, or a workers' compensation program or policy, *you must reimburse us out of that payment.* Our right of reimbursement extends to any payment received by settlement, judgment, or otherwise.
>
> We are entitled to reimbursement to the extent of the benefits we have paid or provided in connection with your injury or illness. However, we will cover the cost of treatment that exceeds the amount of the payment you received.
>
> *Reimbursement to us out of the payment shall take first priority (before any of the rights of any other parties are honored)* and is not impacted by how the judgment, settlement, or other recovery is characterized, designated, or apportioned. Our right of reimbursement is not subject to reduction based on attorney fees or costs under the "common fund" doctrine and *is fully enforceable regardless of whether you are "made whole" or fully compensated for the full amount of damages claimed*.

Clerk's Papers (CP) at 24 (emphasis added).

Maylone made a claim with Hartford for UIM benefits.[1] The policy provided coverage to Maylone in the event of injury or damage from an uninsured motorist, but it also stated that "[the Hartford] will not make a duplicate payment under this coverage for any element of loss for which payment has been made by or on behalf of persons or organizations who may be legally responsible." CP at 203. The UIM policy limits were $100,000.

As an employee of the United States Department of Veterans Affairs, the health insurance Maylone received from Kaiser was subject to FEHBA. FEHBA provides for, and administers, health insurance for federal employees and is intended to ensure that federal employees enjoy consistent benefits across the country. Accordingly, FEHBA expressly preempts state laws that "relate[] to health insurance or plans." 5 U.S.C. § 8902(m)(1). The purpose of this provision is to ensure uniformity in the administration of FEHBA benefits regardless of different state provisions that may otherwise be applicable. *See Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 137 S. Ct. 1190, 1197, 197 L. Ed. 2d 572 (2017).

Congress has given the Office of Personnel Management (OPM), the governmental agency responsible for administering FEHBA, broad rulemaking authority, and the agency has adopted regulations governing reimbursement provisions in FEHBA contracts. Certain regulations require that specific provisions be included in health insurance plans offered to federal employees. 5 C.F.R. § 890.106. One of these regulations states that health insurance plans must give the insurers a right to subrogation and reimbursement. 5 C.F.R. § 890.106(a). Reimbursement

---

[1] A UIM policy provides an insured with coverage when an insured is involved in an accident where the liable party has no insurance, is underinsured, or cannot be located.

requires an insured to make payment of any recovered costs directly to the health insurance provider. *Coventry* 137 S. Ct. at 1194.

Given the extent of Maylone's injuries and medical bills, the Hartford offered to settle with Maylone for the $100,000 UIM policy limits.

Subsequently, Kaiser sent a letter to Maylone explaining his benefits and Kaiser's right to subrogation and reimbursement under the medical coverage agreement. And knowing that Maylone had also made a UIM claim with the Hartford, Kaiser sent a letter to the Hartford advising them of Kaiser's reimbursement rights, asserting a right to reimbursement over the entire proposed Hartford settlement amount. Kaiser also sent a letter to both the Hartford and Maylone, stating that any UIM settlement proceeds should be made payable directly to Kaiser.

Maylone, unhappy with Kaiser's demand for reimbursement, threatened to stop pursuing his claim with the Hartford if that settlement would leave him with nothing. Maylone also disputed Kaiser's right to reimbursement under FEHBA. He maintained that Kaiser's right to reimbursement could not be applied unless and until he was "made whole."[2] CP at 66-67. Maylone warned that there was a "very real possibility . . . that Kaiser [would] collect nothing as [he had] no incentive to consummate any settlement with his UIM insurer." CP at 68.

Notwithstanding these discussions, Maylone settled his UIM claim with the Hartford for the policy limits in March 2019. The settlement stated that, in exchange for Maylone's release of his claims against the Hartford, the Hartford would pay $100,000. The settlement did not specify to whom the proceeds would be payable. After the settlement was reached, the Hartford sent

---

[2] The "made whole" rule, described below, is a creation of Washington common law that Maylone argued was not preempted by FEHBA.

5

Maylone a check for $100,000. Notably, however, the Hartford's check was made payable jointly to both Maylone and Kaiser.

Maylone did not deposit the check, and contentious discussions continued between the parties. In June 2019,[3] Maylone informed Kaiser that he had received the payment from the Hartford but if Kaiser did not reduce its claim, he would "frame" the check so that "no one gets a dime." CP at 21, 345.

In December 2019, Kaiser brought an action for declaratory relief requesting that Maylone be ordered to pay the proceeds from the UIM agreement to Kaiser. Maylone filed a counterclaim for tortious interference with contract.

Three months after the commencement of this action, Maylone returned the check to the Hartford with a written notice that he was rescinding the settlement agreement due to a failure of consideration.[4] Maylone told the Hartford that it had violated the settlement agreement by making the settlement check payable to Kaiser.

## II. SUMMARY JUDGMENT

Kaiser brought a motion for summary judgment, arguing that it had a right to reimbursement under FEHBA and that Maylone's tortious interference with contract claim failed

---

[3] Although the declaration of Pamela Henley on behalf of Kaiser, dated September 23, 2020, says that the information was conveyed in June 2020, the context of the statement in the declaration indicates that it was in fact June 2019, and Kaiser states in its memorandum in support of its motion for summary judgment that it occurred in June 2019.

[4] Although Maylone claims in his reply brief that he returned the check before Kaiser brought its claim for declaratory relief, he does not support this contention with citations to the record and his declaration and the attached exhibit indicated otherwise.

as a matter of law. Maylone filed a cross motion for summary judgment, asking the superior court to dismiss Kaiser's declaratory judgment claim and grant judgment in favor of Maylone on his counterclaim for tortious interference with contract. During the consideration of these motions, the proceeds of the Hartford settlement were paid into the registry of the superior court.[5]

The superior court granted Kaiser's motion for summary judgment, granting declaratory relief to Kaiser with regard to the payment of the UIM proceeds and dismissing Maylone's tortious interference with contract claim. The superior court also denied Maylone's motion for summary judgment.

Maylone appeals.

## ANALYSIS

### I. STANDARD OF REVIEW AND ARGUMENTS

#### A. SUMMARY JUDGMENT

We review summary judgment motions de novo. *M.E. v. City of Tacoma*, 15 Wn. App. 2d 21, 31, 471 P.3d 950 (2020), *review denied*, 196 Wn.2d 1035 (2021). "Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions demonstrate the absence of any genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* A fact is material if it affects the outcome of the litigation. *Id.*

---

[5] Although Maylone alleged he returned the settlement proceeds to the Harford, Kaiser confirmed during oral argument before this court that the proceeds were deposited in the registry of the superior court. Wash. Court of Appeals oral argument, *Kaiser Found. Health Plan v. Maylone*, No. 55585-9 (May 3, 2022), at 14 min., 40 sec., 22 min., 15 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

When the moving party files a motion for summary judgment and shows an absence of evidence to support the nonmoving party's position, the burden then shifts to the nonmoving party to demonstrate that a genuine issue of material fact does indeed exist. *Berry v. King County*, 19 Wn. App. 2d 583, 587, 501 P.3d 150 (2021). "The nonmoving party cannot rely on 'speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value.' " *M.E.*, 15 Wn. App. 2d at 31-32 (quoting *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986)). Summary judgment requires the nonmoving party to present more than "ultimate facts" or conclusory statements. *Id.* at 32. Summary judgment is proper where the nonmoving party fails to show evidence sufficient to establish an essential element of their case and on which they would have the burden of proof at trial. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

B. UNIFORM DECLARATORY JUDGMENTS ACT

The Uniform Declaratory Judgments Act (UDJA) governs declaratory judgment actions. Ch. 7.24 RCW. The UDJA states that "[a] person interested under a . . . written contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status or other legal relations thereunder." RCW 7.24.020. "A contract may be construed either before or after there has been a breach thereof." RCW 7.24.030. The UDJA "is to be liberally construed and administered" "to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." RCW 7.24.120. The UDJA permits the court to adjudicate the rights between the parties and to remove future uncertainties, so long as there is a justiciable controversy. *See Bainbridge Citizens United v. Dep't of Nat. Res.*, 147 Wn. App. 365, 374, 198 P.3d 1033 (2008) ("the UDJA grants, trial courts the

general power to 'declare rights, status and other legal relations' if 'a judgment or decree will terminate the controversy or remove an uncertainty' ") (quoting RCW 7.24.010, .050). Additionally, the UDJA permits the joinder of parties if necessary for resolution of claims brought under the Act, providing that "all persons shall be made parties [to an action brought under the UDJA] who have or claim any interest which would be affected by the declaration . . . ." RCW 7.24.110.

## II. KAISER'S RIGHT TO REIMBURSEMENT

### A. FEHBA PREEMPTION

### 1. Legal Principles

The doctrine of preemption finds its roots in the Supremacy Clause of the United States Constitution. U.S. Const. art. VI. Under the preemption doctrine, where a federal law is in conflict with a state law, the federal law preempts the state law. *Veit v. Burlington N. Santa Fe Corp.*, 171 Wn.2d 88, 99, 249 P.3d 607 (2011). However, " 'the historic police powers of states to provide for the health, safety, and welfare of their citizens are not preempted unless that is the clear and manifest purpose of Congress.' " *Reece v. Good Samaritan Hosp.*, 90 Wn. App. 574, 578, 953 P.2d 117 (1998) (quoting *Becker v. U.S. Marine Co.*, 88 Wn. App. 103, 107-08, 943 P.2d 700 (1997)), *review denied*, 136 Wn.2d 1018 (1998). If Congress has expressly defined the preemptive scope of a statute, preemption is limited to that scope. *Id.* "When . . . the reach of a preemptive federal law is not explicitly defined, it depends on the statutory context surrounding the preemption clause, and the purpose Congress sought to achieve by the statute." *Id.* (quoting *Becker*, 88 Wn. App. at 107-108).

FEHBA "establishes a comprehensive program of health insurance for federal employees." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 682, 126 S. Ct. 2121, 165 L. Ed. 2d 131 (2006). FEHBA authorizes OPM to contract with private carriers to offer health insurance plans to federal employees. *Id.* The statute provides that certain required terms of these health insurance contracts preempt conflicting state law:

> The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which *relates to* health insurance or plans.

5 U.S.C. § 8902(m)(1) (emphasis added). The purpose of this provision is to ensure uniformity in the administration of FEHBA benefits regardless of different state provisions that may otherwise be applicable. *Burkey v. Gov't Emps. Hosp. Ass'n*, 983 F.2d 656, 660 (5th Cir. 1993). The patchwork imposition of a whole array of differing state laws to health insurance contracts for federal employees would undermine the purpose and objectives of the statute of promoting uniformity in the administration of benefits. *Hartenstine v. Superior Ct. of San Bernardino County*, 196 Cal. App. 3d 206, 219-20, 241 Cal. Rptr. 756 (1987), *cert. denied*, 488 U.S. 899 (1988).

FEHBA's implementing regulations state that its private carriers are entitled to "pursue subrogation and reimbursement recoveries, and shall have a policy to pursue such recoveries . . . ." 5 C.F.R. § 890.106(a).[6] This right to reimbursement and subrogation recoveries is "a condition of and a limitation on the nature of benefits or benefit payments and on the provision

---

[6] "Federal regulations have the same preemptive power as federal statutes." *McCurry v. Chevy Chase Bank, FSB*, 169 Wn.2d 96, 100, 233 P.3d 861 (2010).

of benefits under the plan's coverage." 5 C.F.R. § 890.106(b)(1). "Reimbursement requires an insured employee who receives payment from another source (*e.g.*, the proceeds yielded by a tort claim) to return healthcare costs earlier paid out by the carrier." *Coventry*, 137 S. Ct. at 1194.

The underlying purpose is tied to limiting federal expenditures on health care costs. "Strong and 'distinctly federal interests are involved' in uniform administration of the program, free from state interference, particularly in regard to coverage, benefits, and payments." *Id.* at 1197 (quoting *Empire Healthchoice Assurance*, 547 U.S. at 696). FEHBA carriers recover a significant amount through subrogation and reimbursement. *Id.* at 1197-98. As a result, the premium costs for the federal government are lower, and it passes this savings on to the insurers, making the health insurance more affordable. *Id.* at 1198 ("Such 'recoveries translate to premium cost savings for the federal government and [FEHBA] enrollees.' ") (quoting 80 Fed. Reg. 29203).

Still, this broad reimbursement right held by insurers under FEHBA conflicts with various state laws. Some states apparently used arguable ambiguity in the breadth of the FEHBA preemption provision to impose their own state laws infringing on the right to reimbursement. *Id.* at 1195. However, in 2015, OPM made its position clear that the right to reimbursement was to be enjoyed by insurers regardless of contrary state laws:

> Some state courts have interpreted ambiguity in Section 8902(m)(1) to reach a contrary result and thereby to allow state laws to prevent or limit subrogation or reimbursement rights under FEHB contracts. In this final rule, OPM is exercising its rulemaking authority under 5 U.S.C. 8913 to ensure that carriers enjoy the full subrogation and reimbursement rights provided for under their contracts.

80 Fed. Reg. 29203. OPM declared that FEHBA "comports with longstanding Federal policy and furthers Congress's goals of reducing health care costs and enabling uniform, nationwide

application of FEHB contracts."[7] *Id.* The agency further clarified that this right to subrogation

and reimbursement includes not only claims against a responsible third party but also includes

"first party claims" like settlements from uninsured and underinsured motorist coverage. *Id.*[8]

Writing for the Court in *Coventry*, Justice Ginsburg addressed the federal statute at issue

here and underscored that the phrase "relate to," a phrase used in two places in 5 U.S.C.

§ 8902(m)(1),[9] has been repeatedly recognized as expressing a " 'broad pre-emptive purpose' "

---

[7] Expanding on the financial impact of the right to subrogation and reimbursement, OPM stated:

> The FEHB program insures approximately 8.2 million federal employees, annuitants, and their families, a significant proportion of whom are covered through nationwide fee-for-service plans with uniform rates. The government pays on average approximately 70% of Federal employees' plan premiums. 5 U.S.C. 8906(b), (f). The government's share of FEHB premiums in 2014 was approximately $33 billion, a figure that tends to increase each year. OPM estimates that FEHB carriers were reimbursed by approximately $126 million in subrogation recoveries in that year. Subrogation recoveries translate to premium cost savings for the federal government and FEHB enrollees.

80 Fed. Reg. 29203.

[8] When describing changes to FEHBA reimbursement rule in 2015, OPM stated:

> [C]ommenters expressed concern with the reference to "a responsible third party" in the definitions, indicating that the use of this phrase has been interpreted to foreclose "first party" claims for subrogation and recoveries, such as uninsured and underinsured motorist coverage . . . . OPM agrees that the definitions of subrogation and reimbursement should include first party claims.

*Id.*

[9] "The terms of any contract under this chapter which *relate to* the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which *relates to* health insurance or plans." 5 U.S.C. § 8902(m)(1) (emphasis added).

when contained in a preemption clause. *Coventry*, 137 S. Ct. at 1193, 1196-97 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992)).

2. Washington Law

Washington law requires that all new and renewed automobile insurance policies include UIM insurance, including protections for individuals injured by phantom drivers, unless the insured explicitly opts out in writing. RCW §§ 48.22.030(2)-(4). The purpose of this statute is to provide broad protection to innocent victims who have suffered a loss. *Pacheco v. Or. Mut. Ins. Co.*, 9 Wn. App. 2d 816, 830, 447 P.3d 207 (2019), *review denied*, 194 Wn.2d 1020 (2020); RCW § 48.22.030(12).

Additionally, Washington follows the *made whole rule*, a common law rule which provides that an insurer may not exercise a right to reimbursement unless and until an insured has received total compensation for their loss. *Grp. Health Coop. v. Coon*, 193 Wn.2d 841, 852, 447 P.3d 139 (2019). An insurer is only entitled to recover "the excess" that an insured has received after the insured has been fully compensated for their loss. *Daniels v. State Farm Mutual Auto. Ins. Co.*, 193 Wn.2d 563, 571, 444 P.3d 582 (2019) (quoting *Thiringer v. Am. Motors Ins. Co.*, 91 Wn.2d 215, 219, 588 P.2d 191 (1978)). " 'This rule embodies a policy deemed socially desirable in this state, in that it fosters the adequate indemnification of innocent automobile accident victims.' " *Sherry v. Fin. Indem. Co.*, 160 Wn.2d 611, 621, 160 P.3d 31 (2007) (quoting *Thiringer*, 91 Wn.2d at 220). The policy also reduces the potential for conflict between insurers and insureds. *Daniels*, 193 Wn.2d at 572, 444 P.3d 582 (2019).

3.  Application

Maylone argues that the FEHBA does not preempt Washington's made whole rule because the made whole rule is not "related to" health insurance as required by the preemption language of FEHBA.[10]  Since it is not preempted, Maylone maintains that the made whole rule prevents Kaiser from obtaining reimbursement from the Hartford settlement proceeds.  We disagree.

Maylone reads FEHBA's preemption provision too narrowly.  He argues that UIM provisions and policies generally, as well as the made whole rule specifically, are "unrelated" to his FEHBA-provided health insurance because they were designed to ensure compensation for innocent victims of irresponsible motorists.  But the mere fact that these laws and policies are broader in scope and general application than just health insurance does not mean that their application does not "relate to" his health insurance sufficiently for FEHBA preemption to apply.  As the *Coventry* Court stated, "the phrase 'relate to' in a preemption clause 'express[es] a broad pre-emptive purpose.' "  137 S. Ct. at 1197 (alteration in original) (quoting *Morales*, 504 U.S. at 383).  The phrase is generally interpreted to mean "any subject that has 'a connection with, or reference to,' the topics the statute enumerates."  *Id.* (quoting *Morales*, 504 U.S. at 384).

The regulatory interpretation and application of FEHBA further supports the preemption of Washington law here.  It is clear from OPM's statements that the provision is intended to ensure that carriers enjoy full reimbursement rights under their contracts notwithstanding various states' attempts to compromise those rights.  The financial impact on the federal government should be

---

[10] Maylone, at times, broadly refers to equitable doctrines that he claims prevent Kaiser from recovering, but he limits his discussion to Washington's made whole rule.  Accordingly, we address only the made whole rule.

reduced to allow the government to provide more affordable and equivalent health insurance to federal enrollees across all states. And *Coventry* endorsed the federal government's ability to impose those policies upon the states.

Maylone relies on language from *McVeigh*, an early FEBHA case, to support his argument that FEHBA preemption is narrow. He points out that the *McVeigh* Court expressly said that although FEHBA contains a preemption clause that displaces state law relating to health insurance plans, it "contains no provision addressing the subrogation and reimbursement rights of carriers." 547 U.S. at 683. *McVeigh* stated that there were two rational readings of the preemption provision—it could reasonably be read narrowly or broadly. *Id.* at 697-98. The Court further stated that FEHBA does not preempt "any and all state laws that in some way bear on federal employee-benefit plans." *Id.* at 698.

Maylone concedes, however, that *McVeigh*'s discussion of reimbursement was dicta because the Court ultimately decided the case on jurisdictional grounds. *Id.* And subsequent to *McVeigh*, the Court in *Coventry* clarified that the preemption clause should be read more broadly than suggested by *McVeigh*'s dicta.

Here, the question is whether the made whole rule, if applied here, *relates to* Maylone's health insurance with Kaiser. It clearly does. In fact, the parties in *Coventry* conceded this issue. *Coventry*, 137 S. Ct. at 1196. UIM coverage is available because Maylone was involved in a car accident with a driver that could not be located. It follows that Maylone's health insurance would pay for his medical expenses. As a result, the Washington UIM laws and policies that would operate to prevent Kaiser from recovering under its right to reimbursement have a clear "connection with" and, therefore, are "related to" the health insurance plan. Simply put, a state

law that directly affects a health insurance company's right to reimbursement, as the made whole rule does here, plainly "relates to" a health plan.

The made whole rule represents the strong public policy of Washington law of protecting innocent victims. Nevertheless, we are bound by FEHBA to hold that Washington UIM provisions and policies, including the made whole rule, that prevent Kaiser from exercising its right to reimbursement are preempted.

B. DUPLICATE PAYMENT PROVISION IN THE HARTFORD CONTRACT

Maylone next argues that the language of his Hartford UIM policy conflicts with Kaiser's request for reimbursement and that these provisions are not preempted by FEHBA. We disagree.

The Hartford's UIM policy states that it covers not only medical expenses but also other economic damages and noneconomic damages. The automobile insurance policy also expressly said it would not make a "duplicate payment" for any element of loss for which payment has been made by an organization that may be legally responsible. CP at 203. Maylone argues that these provisions—contained in the medical coverage portion of his Hartford policy—prevent Kaiser from exercising its right to subrogation and reimbursement. If Kaiser has already paid for medical expenses, Maylone argues, then the Hartford had no obligation to pay medical expenses because such payments would be "duplicate payments." Therefore, the Hartford's $100,000 settlement offer must have related only to noneconomic damages.

However, the term "legally responsible" in the duplicate payments clause refers to entities that are legally responsible *in tort* for the insured's injuries—i.e., the tortfeasor who caused the accident and any entity vicariously liable. *See Fischer v. Midwest Sec. Ins. Co.*, 2003 WI App 246, ¶¶ 23-25, 268 Wis. 2d 519, 532, 673 N.W.2d 297 (2003) (duplicate payment provision in

UIM policy intended to prevent tortfeasor and insurer from compensating insured for same element of loss); *Berrey v. Travelers Indem. Co. of Am.*, 770 F.3d 591, 594-95 (7th Cir. 2014) (permitting double recovery under UIM policy would flout purpose of UIM policies to place insured in same position they would have been had the tortfeasor carried adequate insurance). There is no indication that the duplicate payments clause refers to payments made by health insurers.

In addition, Maylone's agreement with Kaiser explicitly states that Kaiser has a right to reimbursement that extends to all settlement proceeds and "is not impacted by how the . . . settlement, or other recovery is characterized, designated, or apportioned." CP at 24. Therefore, it does not matter whether the Hartford characterized its $100,000 settlement offer as a payment for medical expenses or for noneconomic damages.

Maylone's duplicate payment argument fails to establish a question of fact here that would prevent summary judgment in favor of Kaiser.

### III. UNCONSCIONABILITY

Maylone next argues that the reimbursement provision in his Kaiser policy is substantively and procedurally unconscionable and, therefore, unenforceable. We determine that the provision is neither substantively nor procedurally unconscionable.

### A. LEGAL PRINCIPLES

A contract may be either substantively unconscionable or procedurally unconscionable. *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 259-60, 544 P.2d 20 (1975), *abrogated on other grounds by Nelson v. McGoldrick*, 127 Wn.2d 124, 896 P.2d 1258 (1995). If a provision in a contract is found to be unconscionable, "[a] court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the

application of any unconscionable clause as to avoid any unconscionable result."  RCW 62A.2-302(1).

Substantive unconscionability occurs when a term in a contract is one-sided or overly harsh.  *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 344, 103 P.2d 773 (2004).  " 'Shocking to the conscience[,]' 'monstrously harsh[,]' and 'exceedingly calloused' are terms sometimes used to define substantive unconscionability."  *Nelson*, 127 Wn.2d at 131 (quoting *Montgomery Ward & Co. v. Annuity Bd. of S. Baptist Convention*, 16 Wn. App. 439, 444, 556 P.2d 552 (1976)).

Procedural unconscionability relates to impropriety during the process of forming a contract—a lack of a "meaningful choice."  *Schroeder*, 86 Wn.2d at 260.  Determining procedural unconscionability requires consideration of " 'all the circumstances surrounding the transaction,' including '[t]he manner in which the contract was entered,' whether each party had 'a reasonable opportunity to understand the terms of the contract,' and whether 'the important terms [were] hidden in a maze of fine print . . . .' "  *Id.* (alterations in original) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. 1965)).

An adhesion contract may be, but is not necessarily, procedurally unconscionable.  *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wn.2d 293, 304, 103 P.3d 753 (2004).  Three factors are used to determine whether an adhesion contract exists: " '(1) whether the contract is a standard form printed contract, (2) whether it was prepared by one party and submitted to the other on a 'take it or leave it' basis, and (3) whether there was no true equality of bargaining power between the parties.' "  *Id.* (internal quotation marks omitted) (quoting *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 393, 858 P.2d 245 (1993)).  Merely showing that a contract is an adhesion contract is insufficient to establish procedural unconscionability.  *Id.*

18

Instead, "the key inquiry for finding procedural unconscionability is whether [the party bringing the claim] lacked meaningful choice." *Adler*, 153 Wn.2d at 348-49.

B. APPLICATION

First, Maylone argues that the reimbursement provision is substantively unconscionable because when it operates to prevent him from receiving any recovery in this case, it prevents him from benefiting from both his UIM policy and health insurance policy. Such a result, Maylone contends, is one-sided and harsh. We disagree.

That Maylone may not be entitled to full recovery here does not make Kaiser's right to reimbursement unconscionable. The key is whether the agreement is so one-sided that only one party benefits. For example, in *Zuver*, the court considered whether a provision requiring that a party who brings a judicial action pay the fees and costs of an opposing party who successfully stays the action or compels arbitration was unconscionable. 153 Wn.2d at 319. The plaintiff argued that the provision was substantively unconscionable because it discouraged her from bringing a discrimination claim against her employer. *Id.* The court determined that awarding fees and costs was not substantively unconscionable because either party could recover, making it not "so one-sided and harsh." *Id.*

Similarly, here, both Kaiser and Maylone benefit from the agreement. While the agreement gives Kaiser the right to reimbursement, in return, Kaiser must initially pay for medical costs in full, regardless of whether its reimbursement rights are realized. Both parties have rights under this term, and both parties benefit. And Kaiser remains liable for medical coverage payments beyond the amount that it can recover under the UIM policy. Maylone fails to show how these provisions are one-sided or overly harsh, especially since a right to reimbursement is actually

19

required to be included in policies administered by FEBHA. Even construing the facts in favor of Maylone, there is no question of fact as to whether the provision was substantively unconscionable. Therefore, we affirm the superior court's summary judgment decision as it relates to substantive unconscionability.

Second, Maylone argues that the provision is procedurally unconscionable because the contract was a contract of adhesion. Maylone, however, presents no argument beyond his bare assertion that the contract is one of adhesion to support a finding of unconscionability. This alone is insufficient to support his claim of procedural unconscionability. *See id.* at 304.

In *Zuver*, the court determined that a contract is not procedurally unconscionable merely because it is a contract of adhesion. 153 Wn.2d at 306-07. A plaintiff must also establish a lack of meaningful choice. *Id.* at 305. Although in *Zuver*, the plaintiff employee argued she lacked meaningful choice because of her unequal bargaining power, the court stated,

> At minimum, an employee who asserts an . . . agreement is procedurally unconscionable must show some evidence that the employer refused to respond to her questions or concerns, placed undue pressure on her to sign the agreement without providing her with a reasonable opportunity to consider its terms, and/or that the terms of the agreement were set forth in such a way that an average person could not understand them.

*Id. at* 306-07. Since the employee had failed to make any of the required showings, the contract was not procedurally unconscionable. *Id.*

Similar to the plaintiff in *Zuver*, Maylone argues that because he has shown that this is a contract of adhesion, he has shown a lack of a meaningful choice because of his unequal bargaining power. But he has failed to present any additional evidence of the dynamics of the contract formation discussed by *Zuver*. This is inadequate to establish procedural unconscionability. *See id.* at 306-07.

Even when the facts are construed in a light most favorable to Maylone, he has failed to establish a question of material fact as to the procedural unconscionability of the provision. Therefore, we affirm the superior court's decision as it relates to procedural unconscionability.

IV. TORTIOUS INTERFERENCE WITH CONTRACT

Kaiser and Maylone both filed motions for summary judgment on Maylone's claim for tortious interference with contract. The superior court granted Kaiser's motion, and Maylone argues that the superior court erred in doing so. We disagree.

A. LEGAL PRINCIPLES

A party claiming tortious interference with a contract must establish five elements:

(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997).

For a tortious interference with contract claim, "[i]ntentional interference requires an improper objective or the use of wrongful means that in fact cause injury to the person's contractual relationship." *Id.* It is not improper interference to exercise one's legal interests in good faith. *Id.*

B. APPLICATION

Maylone maintains that the superior court erred in granting Kaiser's motion for summary judgment on his tortious interference with contract claim. He argues that he established all of the required elements of a claim because: (1) Kaiser had no right to contact the Hartford regarding its request for reimbursement, and its communication caused the Hartford to breach its contract with Maylone, (2) Kaiser's interference was intentional and substantially certain to cause the Hartford

21

to breach its contracts, and (3) Kaiser's interference was with an improper purpose and by an improper means because Kaiser had no authority to instruct the Hartford to pay them directly. We disagree with Maylone and affirm the superior court's summary judgment dismissal of this claim.

Maylone argues that Kaiser's interference was improper because it was not authorized under his medical coverage agreement and that Kaiser "misrepresented both the nature of the alleged claim and also any role whatsoever to have been played by [t]he Hartford." Br. of Appellant at 48. However, Maylone fails to explain these conclusory statements. There is no evidence in the record of an improper purpose for Kaiser's action or that it employed improper means; there is no evidence of bad faith. Kaiser paid Maylone's medical bills resulting from Maylone's car accident. Kaiser merely informed Maylone and the Hartford of its right to reimbursement and requested that proceeds from a UIM settlement be made out to Kaiser.

But critically, Maylone has failed to show any damages resulting from Kaiser's alleged interference. Under Maylone's medical coverage agreement with Kaiser, he was required to pay the entire settlement amount to Kaiser upon receipt from the Hartford. The Hartford's decision to make the proceeds payable to both Maylone and Kaiser did not result in any loss to Maylone because he would not have been permitted to keep the proceeds in any event.

Because Maylone has failed to show intentional interference with an improper objective or the use of a wrongful means and because Maylone cannot show any damages, we determine there was no question of material fact and the superior court did not err in granting summary judgment on Kaiser's behalf in regard to the tortious interference with contract claim.

## V.  RECEIPT OF SETTLEMENT PROCEEDS AND RESCISSION

Maylone finally argues that he never effectively received settlement proceeds because the check he received was not able to be deposited due to it being payable jointly to both Kaiser and him.  He contends that because he never received the proceeds, no settlement was completed and, therefore, Kaiser's right to reimbursement had not been triggered.  Maylone further contends that he subsequently rescinded the settlement agreement because of the Hartford's failure to send him an appropriate check.  We agree that Maylone did not receive the settlement proceeds.

### A.  LEGAL PRINCIPLES

Rescission of a contract results in restoration of parties, as much as practical, to their positions prior to entering into a contract.  *Ten Bridges, LLC v. Guandai*, 15 Wn. App. 2d 223, 243, 474 P.3d 1060 (2020), *review denied*, 197 Wn.2d 1011 (2021).  "Rescission can only occur when there is a mutual consent to rescind the contract, or a demand to rescind by one side with acquiescence by the other, a material breach by one party with a claim of rescission by the other or other circumstances not material here."  *Woodruff v. McClellan*, 95 Wn.2d 394, 397, 622 P.2d 1268 (1980).  Rescission of a contract requires the party wishing to rescind act with reasonable promptness, and delay may result in a waiver of a right to rescind.  *Bunting v. State*, 87 Wn. App. 647, 653-54, 943 P.2d 347 (1997).

B. APPLICATION

Here, the Hartford sent Maylone a check for $100,000, as provided for in the settlement agreement. However, the check was made out to both Kaiser and Maylone.[11] As a result, Maylone could not deposit or cash the check without Kaiser's assent. Accordingly, receipt of the Hartford check did not constitute receipt of the settlement proceeds *by Maylone*. Although these proceeds were subsequently deposited in the court registry, the superior court erred when it prematurely ordered these proceeds to be distributed.

Whether these proceeds will be eventually distributed to Kaiser depends on whether Maylone effectively rescinded the Hartford settlement agreement. If there was no rescission, the settlement is binding. If binding, it follows from our conclusions above that the settlement proceeds in the court registry must be paid to Maylone, who, in turn, must then pay the proceeds to Kaiser consistent with Kaiser's contractual right to reimbursement. However, if the settlement was successfully rescinded, the funds must be returned to the Hartford.

On this critical question of whether the settlement agreement was rescinded, we determine there is an issue of material fact. Effective rescission requires a factual evaluation of the Hartford and Maylone's conduct, including resolving questions like whether there was a material breach, whether there was acquiescence, or whether parties acted with reasonable promptness. On remand, the superior court shall conduct proceedings to determine whether or not the Hartford settlement was in fact rescinded by Maylone. The UDJA provides both the broad authority and flexibility to

---

[11] As explained above, we have concluded that Kaiser's communication with the Hartford was not tortious interference. We take no position on whether the Hartford, a nonparty to this case, breached any duty to Maylone by issuing the settlement check jointly to Maylone and Kaiser.

the superior court to resolve these issues on remand, including the possibility of joining the Hartford to this action and directing Maylone to turn over to Kaiser any proceeds he receives from this or future Hartford settlements. *See* RCW 7.24.110, .030.

## CONCLUSION

Kaiser has a FEHBA-authorized right to reimbursement over the settlement proceeds from the Hartford. Therefore, despite its importance to Washington's common law protection of injured individuals, the made whole rule is preempted in this context because it relates to, and affects, this health insurance coverage. Additionally, Maylone has failed to show the following: the "duplicate payments" provision in his Hartford policy affects Kaiser's right to reimbursement, the medical coverage agreement was either substantively or procedurally unconscionable, and Kaiser intentionally interfered with an improper motive or the use of improper means with his contracts with the Hartford.

However, we hold that Maylone never received the settlement proceeds and there is a genuine issue of material fact as to whether the settlement agreement was effectively rescinded. For this reason, we reverse the superior court's summary judgment order and remand for a determination as to whether the settlement agreement was rescinded and, following resolution of that question, further proceedings in accordance with this opinion.

No. 55585-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, C.J.

MAXA, J.